# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39955**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Mariano L. JACKSON**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 23 May 2022

————————————

*Military Judge:* Thomas J. Alford.

*Sentence:* Sentence adjudged 9 March 2020 by GCM convened at the United States Air Force Academy, Colorado. Sentence entered by military judge on 2 April 2020: Bad-conduct discharge, confinement for 3 years, reduction to E-1, and a reprimand.

*For Appellant:* Major Jenna M. Arroyo, USAF; Major Ryan S. Crnkovich, USAF.

*For Appellee:* Lieutenant Colonel Matthew J. Neil, USAF; Major John P. Patera, USAF; Mary Ellen Payne, Esquire.

Before POSCH, RICHARDSON, and CADOTTE, *Appellate Military Judges*.

Senior Judge POSCH delivered the opinion of the court, in which Judge RICHARDSON joined. Judge CADOTTE filed a separate opinion dissenting in part and in the result.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

POSCH, Senior Judge:

After a contested trial in which Appellant testified in his own defense, a general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas and testimony, of four specifications of assault consummated by a battery upon AJ (his spouse),[1] and three specifications of assault consummated by a battery upon an intimate partner, KM, in violation of Article 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 928.[2] Appellant was also found guilty, contrary to his pleas, of two specifications of failure to obey a lawful general regulation by wrongfully failing to register two privately owned firearms, a handgun and a rifle, that he kept in his on-base residence, in violation of Article 92, UCMJ, 10 U.S.C. § 892, *Manual for Courts-Martial, United States* (2019 ed.) (2019 *MCM*).[3] The members sentenced Appellant to a bad-conduct discharge, confinement for three years, reduction to the grade of E-1, and a reprimand.[4] The convening authority waived mandatory forfeitures for the benefit of Appellant's son, but did not otherwise disturb the adjudged sentence.

On appeal, Appellant raises 13 issues, 10 of which are assignments of error raised through appellate counsel. Appellant asks whether: (1) his conviction for assault consummated by a battery by grabbing KM's neck *and torso* with his arms, as charged in Specification 2 of Charge II, is legally and factually insufficient; (2) his convictions for failure to obey a lawful general regulation are legally and factually insufficient because the regulation at issue was not

---

[1] AJ was a junior enlisted Airman during the charged timeframe and a noncommissioned officer at trial.

[2] The specifications that involve AJ had an aggregate charging window between 1 May 2016 and 31 May 2017, and thus Article 128, UCMJ, 10 U.S.C. § 928, in the *Manual for Courts-Martial, United States* (2016 ed.), applies. The specifications that involve KM allege conduct on 24 April 2019, and thus Article 128, UCMJ, in the *Manual for Courts-Martial, United States* (2019 ed.) (2019 *MCM*), applies. *See* Exec. Order 13,825, §§ 3 and 5, 83 Fed. Reg. at 9890 (8 Mar. 2018). To be clear, Appellant was not charged with an offense in violation of Article 128b, UCMJ, 10 U.S.C. § 928b (Domestic Violence) (2019 *MCM*). *See* National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232, § 532. Unless otherwise indicated, all references to non-punitive UCMJ provisions, Rules for Courts-Martial, and Military Rules of Evidence (Mil. R. Evid.) are to those contained in the 2019 *MCM*.

[3] Appellant was acquitted of three specifications of assault consummated by a battery, two specifications of communicating a threat, and one specification of attempted murder.

[4] The military judge credited Appellant with 320 days served in pretrial confinement.

properly published and cannot qualify as a general regulation; (3) trial counsel improperly cross-examined Appellant by referring to Appellant's attendance at a domestic violence treatment program and by asking him whether the mechanism of injury was consistent with the opinion of an expert witness called by the Government; (4) in a related claim, trial defense counsel were constitutionally ineffective for failing to timely object to trial counsel's improper cross-examination of Appellant;[5] (5) the military judge's failure to instruct the panel that a guilty verdict must be unanimous was not harmless beyond a reasonable doubt; (6) trial counsel's sentencing argument was improper because it faulted Appellant for failing to apologize, it appealed to what the "audience" would think, and it asked the members to consider the "trauma" inflicted upon a non-victim; (7) the military judge erred by instructing the members in sentencing that they will not draw any adverse inference from the fact that Appellant elected to make a statement that was not under oath after the military judge specifically asked the Defense whether it wanted this instruction and the Defense replied it did not; (8) the convening authority erred by failing to take complete action on the sentence; (9) the convening authority's reprimand improperly commented on Appellant's defense at trial and rights against self-incrimination, thereby rendering the reprimand inappropriately severe and in violation of Appellant's rights under the Fifth and Sixth Amendments[6] and Article 37, UCMJ, 10 U.S.C. § 837; and (10) Appellant is entitled to relief for violation of his right to timely post-trial processing.

In addition to these assignments of error, Appellant personally raises three issues pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). Appellant contends that (11) the military judge erred in denying the Defense's motions to compel discovery and subsequent motion for a lost-evidence instruction after the Government was asked to preserve certain evidence, but failed to timely respond to the Defense's discovery request; (12) the military judge erred in allowing the Government to admit Appellant's statements without

---

[5] In Appellant's 19 July 2021 opposition to the Government's motion to compel affidavits or declarations from Appellant's trial defense counsel on this issue, Appellant asserts that assignment of error (4) "has been expressly raised in the alternative and would be rendered unripe or moot in its entirety" if the court resolves other assignments of error in his favor. Appellant makes a similar claim in his brief. Considering the jurisdiction conferred on the court by Article 66, UCMJ, 10 U.S.C. § 866, we are not convinced that pleading an assignment of error in the alternative compels that we may consider that claim if, and only if, another claim is found to be without merit.

[6] U.S. CONST. amend. V, VI.

timely disclosure under Mil. R. Evid. 304(d) even after the military judge recognized the Government's repeated failures to provide timely notice and discovery to the Defense; and (13) the military judge erred in denying Appellant's motion to suppress statements made to law enforcement and evidence derived therefrom because he invoked his right to counsel, and the military judge further erred in denying Appellant's motion to suppress evidence obtained in violation of Appellant's rights under the Fourth Amendment.[7] In addition to these contentions, the court considers the issue of timely appellate review.

With respect to issues (5), (11), (12), and (13), the court considered Appellant's arguments and finds none of the issues warrants further discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). Specifically in regard to arguments in issue (5) that are founded in constitutional guarantees that are germane to trials by jury, the court finds the military judge did not err. *Id.*; *see also United States v. Tovarchavez*, 78 M.J. 458, 465 (C.A.A.F. 2019) ("Lower courts should follow the case which directly controls, leaving to [the United States Supreme] Court the prerogative of overruling its own decisions." (alterations in original omitted) (quoting *Agostini v. Felton*, 521 U.S. 203, 237 (1997)).

The court finds Appellant's convictions are legally and factually sufficient, and no error materially prejudicial to the substantial rights of Appellant occurred. We affirm the findings and sentence.

## I. BACKGROUND

Appellant and AJ met at basic training in the summer of 2014. After reporting to units at different Air Force installations in the United States, they married in November 2014, and their son was born in the summer of 2015. A few months after the birth of their son, AJ was reassigned to the United States Air Force Academy (USAFA) in Colorado Springs, Colorado, where she joined Appellant. At the USAFA, the three lived together in a house on the installation.[8] It was in this residence that evidence showed Appellant committed the acts charged in the nine convictions under review.

### A. Assault Consummated by a Battery upon AJ

AJ testified at Appellant's trial. She and Appellant "had a good friendship" in the first years of their marriage until it took a turn for the worse.

---

[7] U.S. CONST. amend. IV.

[8] During the relevant period, Appellant and AJ were assigned to units subordinate to the 10th Air Base Wing, which reports to the United States Air Force Academy (USAFA). In this opinion, "base," "installation," and the "USAFA" are synonymous.

On 10 May 2016, Appellant assaulted AJ in their living room by grabbing her neck with his hands. She could not "remember the events leading up to the actual incident" and denied being physically aggressive with Appellant on that occasion or any other. She did "recall that he strangled [her]." Appellant "used two hands" and "[i]t lasted maybe 15 seconds, [or] 20 seconds." During the incident, AJ could not breathe, she "was frozen in fear [and she] couldn't fight him off [because she] was too afraid." After the incident, it hurt to touch or move her neck. AJ took pictures of her injuries, copies of which were admitted into evidence at trial. AJ took the pictures because she wanted "to capture the red marks on [her] neck and on [her] chest." At the time, she wanted to document her injuries "because [she] kn[e]w [she] wasn't ready to tell anyone yet." AJ did not leave Appellant because she "was still trying to work on [her] marriage, [she] loved him, and [they] also had a son together."

A year later, during an incident that began in their son's bedroom, Appellant again strangled AJ by grabbing her neck with his hands. The physical confrontation started when Appellant grabbed AJ's arm with his hand. AJ testified that in mid-May 2017 she and Appellant were in their son's room and she "was trying to tell [her son] goodnight, but for some reason, [Appellant] was blocking [her], and it made [her] upset." AJ called Appellant "a b[**]ch" and that "sent him into a rage." Appellant then "grabbed" AJ's "right forearm and drug [her] out of the room" into the hallway. He grabbed AJ's arm with such force that he "left some scars" that were still visible on her arm when she recounted what happened in testimony given almost three years later.

In the hallway, Appellant shoved AJ into a "very small space" between a washer and dryer where she barely fit and could not move freely. In doing so, Appellant "pushed" on her "torso" and then "started to strangle [her] with both of his hands" that he had "[a]round [her] neck." As he strangled her, Appellant was yelling, "Who's the b[**]ch now?" AJ testified she could feel "a lot of pressure on [her] neck and [her] face and [her] eyes" that lasted "[m]aybe 15 to 20 seconds." The pressure "was very, very forceful[ and she] thought [she] was going to die." The squeezing of her neck "was very painful," she "couldn't breathe," and her "vision started blacking out." Using her own words to describe the fear she felt at the time, she testified, "I was afraid. I really—I thought I was going to die." The incident ended when Appellant "just kind of stopped and walked away" to another room in the house. AJ described the strangulation as "way more forceful" than the assault a year earlier. Immediately after the incident, AJ locked herself in the bathroom and again took pictures documenting her injuries, which were also admitted into evidence. Like the strangulation incident by Appellant a year earlier, this incident also made it painful to touch or move her neck.

In October 2018, AJ told Appellant that she did not want a relationship anymore and that she planned to move out of their USAFA residence when she finished Airman Leadership School. AJ hastened her departure when, "[i]n November of 2018, two days before Thanksgiving, [Appellant] kicked [AJ] out of [their] home." In time, AJ moved into an apartment off-base. She formally reported the incidents when she sought counseling in mid-December 2018, which led to an investigation by military law enforcement.[9] She filed for divorce in February 2019.

In April 2019, AJ answered a phone call from her first sergeant informing her that Appellant had been apprehended and that she should come to the USAFA to pick up her son. AJ went to Appellant's residence and was greeted by KM, a woman AJ had never met until "she answered the door." KM appeared to be "very upset[ and] she was crying." KM "briefly told [AJ] what happened" that evening as she helped AJ gather and pack up her son's things.

## B. Assault Consummated by a Battery upon KM

KM also testified at Appellant's trial. She explained their friendship began when she responded to a picture she saw of Appellant's son on a social media application in the summer of 2018. In time, Appellant and KM began communicating over the Internet. In November 2018, Appellant asked KM to move to Colorado and live with him and his son. She agreed and did so with the intention "[j]ust to start a new life."

KM testified about meeting Appellant for the first time in-person and moving into the USAFA house Appellant shared with his son. Appellant picked KM up from the airport when her flight landed on the Tuesday after Thanksgiving in November 2018. She testified, "It felt like I knew him my whole life." They spent time together enjoying activities such as hiking and bowling, and KM found a job in Colorado Springs. Appellant's son "didn't live [with them] full time," but he "was there quite a lot." Initially, "It was really good. [They] were happy. It was like -- it was a thing [they]'d been doing for forever." Although KM and Appellant had arguments, she stated their differences were minor.

The relationship took a turn for the worse in early February 2019. KM answered the door to their home and a process server called on Appellant to serve him with divorce papers. It was at that moment when KM "found out for a fact" that Appellant was still married. From that point forward, KM "didn't trust him at all," and they argued "[e]very day." Despite their differences, and KM

---

[9] Subsequently, Appellant's commander directed him to attend domestic violence treatment sponsored by the installation's Family Advocacy Program. Without objection, trial counsel questioned Appellant about his participation in that program, which Appellant challenges in assignment of error (3).

wanting to leave Appellant at times, she cared about him and thought they might make the relationship work.

On 24 April 2019, before the incident in question, Appellant and KM spent the afternoon looking at apartments and houses off-base. In the evening, KM prepared food for supper. Appellant's son would not eat, so KM asked Appellant to "get off of his game and his phone" to help with his son. In her words, "It was like we didn't exist." Later in the living room, Appellant said he would be leaving to go to a softball game with some people from work. KM inquired if she and Appellant's son were invited, and Appellant told her, "No, [be]cause she only invited me."[10] A verbal altercation ensued because, as KM explained at trial, "there was a time in the past where there was a lot of issues with another female." Appellant told her, "I'm done with you. I'm not doing this anymore." KM went into a different room to calm down and "just kind of let it blow over."

Later in the evening, Appellant told her, "It's been a nice run," which KM understood to mean that their relationship was over. She told him, "If it's done, then don't touch me," and left the room. A few minutes later, Appellant sent her a screenshot of the next flight back to her home. After more verbal altercations, KM sat on the floor in the living room and begged Appellant to talk to her "because [she] didn't understand at all" why he wanted her to go. When she put her hand on Appellant's leg, he told her, "Don't do that because you know what's going to happen." KM testified Appellant "kept telling [her] how he was done with [her]," and they "were both saying hateful things." At one point, KM stood up, threw her eyeglasses across the room, and told Appellant, "F[**]k you. I hate you." She threw a squishy ball—a dog toy—at him, and began to leave the room.

As KM left, she "could feel like somebody [was] coming behind [her]." She turned around and Appellant "grabbed [her] by [her] sweater" and "walked backward with [her]. [A]t one point, he also had a hand on [her] neck." Appellant grabbed her by the shoulders,[11] "turned [her] around and had [her] against the wall. And then he put [her] in like a chokehold." Appellant "had one of his arms around [her] neck and then the other one kind of like holding his arm." KM explained: "I was trying to get away from him. I was trying to put my hands in between so that I could breathe because I couldn't breathe."

---

[10] Appellant testified he thought it would be inappropriate to bring a girlfriend to an official function while he was going through a divorce.

[11] Appellant contests the evidentiary sufficiency of his conviction for grabbing KM "on the neck *and torso* with his arms" (emphasis added) (Specification 2 of Charge II). This opinion further discusses, *infra*, evidence that supports this conviction in more detail.

Appellant "straddled" KM after she fell to the floor, and placed "both of his hands around [her] neck." KM was "begging" Appellant to stop while also "apologizing." Appellant told her "[s]orry isn't going to work this time" and that "he'd risk everything." At one point, Appellant also had "a hand on [her] mouth and nose." KM "was kicking [her] legs" and "trying to dig [her] hands in between his hands and [her] neck." She was also "hitting him" and "trying to grab things" to "get away." She "was trying to make as much noise as [she] could," including "trying to hit the window" by the front door, hoping a neighbor would hear. KM could not breathe while Appellant strangled her. She also experienced "hot flashes" and problems with both her hearing and vision. KM continued to struggle and "somehow" they "ended up on [their] sides."

Appellant was behind KM with "his legs wrapped around" her. Appellant told KM "nobody was going to help [her]." In that moment, KM "really thought [she] was going to die." She "thought that was it. All [she] could think about was [her] family and how . . . they wouldn't understand. [She] was scared." She also thought about Appellant's son and "was really worried that he would wake up and see what was going on." In time, she "tried to stay as quiet as [she] could because [she] . . . didn't want that image in [the son's] head of seeing his dad doing something like that." KM described "going out of it again" and did not recall Appellant "getting off" her. KM testified her "neck was very, very tender" in the days after the assault and it hurt to breathe, speak, and "any movement . . . was very, very sore."

After receiving a call about a domestic disturbance, military law enforcement responded to Appellant's USAFA residence. Appellant was taken into custody and ordered into pretrial confinement. As noted above, when AJ learned Appellant had been apprehended, she went to the residence where she picked up her son and met KM. Photographs of KM's injuries, and a report prepared by a forensic nurse examiner that documented those injuries, were admitted as evidence along with testimony from the nurse.

## C. Failure to Obey a Lawful General Regulation

In March 2019, Appellant and KM left Colorado to visit his parents. Appellant purchased a Glock handgun, which he brought back with him to Colorado. As they were entering the USAFA, Appellant told KM he had to put the gun under his seat because it was not registered with the installation.

Upon military law enforcement personnel responding to Appellant's residence for the 24 April 2019 assault of KM, they learned Appellant kept the handgun in an entertainment center in his living room and also owned an AR-15 rifle that he kept disassembled in a box in a closet in the back of the house. Evidence showed Appellant failed to register either the handgun or rifle with the USAFA 10th Security Forces Squadron. Appellant was convicted of two

specifications of failing to obey a lawful general regulation by having unregistered privately owned firearms stored in his on-base residence.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant challenges the legal and factual sufficiency of one conviction for assault consummated by a battery upon KM, and his two convictions for failure to obey a lawful general regulation. We consider both challenges in turn.

#### 1. Law

A Court of Criminal Appeals (CCA) may affirm only such findings of guilty as it "finds correct in law and fact and determines, on the basis of the entire record, should be approved." Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1). Article 66(d)(1) "requires the Courts of Criminal Appeals to conduct a *de novo* review of legal and factual sufficiency of the case." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted) (interpreting Article 66(c), UCMJ, in a pre-2019 *MCM*). Our assessment is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). To reach a determination of legal sufficiency, there must be some competent evidence in the record from which the trier of fact was entitled to find beyond a reasonable doubt, the existence of every element of the offense charged. *United States v. Wilson*, 6 M.J. 214, 215 (C.M.A. 1979).

When examining the evidence in the light most favorable to the prosecution, "a rational factfinder[ ] could use his 'experience with people and events in weighing the probabilities' to infer beyond a reasonable doubt" that an element was proven. *United States v. Long*, 81 M.J. 362, 369 (C.A.A.F. 2021) (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954)). As a result, an examination for legal sufficiency "involves a very low threshold to sustain a

conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted), *cert. denied*, __ U.S. __, 139 S. Ct. 1641 (2019).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399).

### 2. Assault Consummated by a Battery upon KM by Unlawfully Grabbing KM's "Torso"

Appellant was convicted of three specifications of assault consummated by a battery upon KM. As relevant to this appeal, in Specification 2 of Charge II, the Government alleged Appellant unlawfully grabbed KM's neck *and torso* in violation of Article 128, UCMJ: "In that [Appellant] . . . did, at or near [the] United States Air Force Academy, Colorado, on or about 24 April 2019, unlawfully grab [KM], the intimate partner of the accused, on her neck and torso with his arms."

For Appellant to be found guilty of this offense, the Government was required to prove beyond a reasonable doubt that Appellant did bodily harm to KM with unlawful force or violence, and that he did so by grabbing her neck and torso with his arms. *See* 2019 *MCM*, pt. IV, ¶ 77.b.(3)(c). "Bodily harm" is defined as "an offensive touching of another, however slight." 2019 *MCM*, pt. IV, ¶ 77.c.(1)(a). "Unlawful force or violence" is demonstrated if an "accused wrongfully caused the contact, in that no legally cognizable reason existed that would excuse or justify the contact." *United States v. Bonner*, 70 M.J. 1, 3 (C.A.A.F. 2011).

Appellant contends that KM's testimony does not support a finding of guilty to the words "and torso." He asks the court to strike and dismiss these words and reassess his sentence. The Government allows that KM did not testify Appellant grabbed her "torso" with his arms by using that word, but argues her testimony and other evidence presented on the merits establish the legal and factual sufficiency of the finding of guilty to the specification that includes these words. In addition to evidence, the Government relies on the definition of "torso" that Appellant relies on in his brief: "the human body apart from the head, neck, arms, and legs: the human trunk." *See* MERRIAM-WEBSTER, *Torso*,

www.merriam-webster.com/dictionary/torso (last visited on 23 May 2022). Because both parties rely on the same dictionary, the court considers this definition for the purpose of analysis, but does not find it necessary to rely on the meaning of a human "torso" from a dictionary or other source to reach a result.

On direct examination, KM testified Appellant "grabbed [her] by [her] sweater . . . [a]nd somehow . . . he turned [her] around and had [her] against the wall." In doing so, he "walked backward with [her]." On cross-examination, KM answered in the affirmative when trial defense counsel asked if Appellant "grabbed you by the shoulders?" She further explained how Appellant grabbed and "flipped [her] around[ ]before he put his arm around [her] neck." Appellant's written statement to the Air Force Office of Special Investigations was also before the factfinder. In that statement he admitted to "placing [his] hand on [KM's] right shoulder."

A rational factfinder could conclude that, among Appellant's acts on 24 April 2019, Appellant used his arms to grab the trunk of KM's body—parts of her body other than her head, neck, and limbs in line with the definition of "torso" in the dictionary that both parties rely on in this appeal. The most direct evidence for this conclusion is KM's testimony that Appellant grabbed KM by the shoulder. At the same time, a rational factfinder could conclude from KM's description of Appellant grabbing her by the sweater, walking her backward, and flipping her around that the charged conduct was accomplished by force Appellant applied to KM's torso when he grabbed her with his hands.

A rational factfinder could reach these same conclusions without expert testimony of the meaning of "torso" or special instruction from the military judge. Not every word in a specification requires definition, even when the word is essential to an element of the offense. *See United States v. Bailey*, 77 M.J. 11, 15 (C.A.A.F. 2017) (explaining the precept that commonly used words, and words used in the vernacular, do not require judicial definition).

Appellant argues shoulders generally are not considered part of one's "torso," but this claim is at variance with the definition of "shoulder" in the same reference both parties rely on for the definition of "torso." *See* MERRIAM-WEBSTER, *Shoulder*, www.merriam-webster.com/dictionary/shoulder (last visited on 23 May 2022) (defining shoulder as the area at which "the arm is connected with the trunk," and shoulders as "the two shoulders and the upper part of the back"). A rational factfinder could conclude Appellant grabbed KM by the upper part of her back, and that the words "and torso" were proven beyond a reasonable doubt, and thus, are not at variance with evidence Appellant applied force to the torso of KM's body with his hands. Drawing all reasonable inferences from testimony in favor of the Government, *Barner*, 56 M.J. at 134, the evidence legally supports Appellant's conviction for grabbing KM's neck

and torso—parts of her body other than limbs—with his arms, and we are convinced beyond a reasonable doubt of Appellant's guilt as charged. The court finds the words "and torso" legally and factually sufficient and we decline to grant the requested relief.

### 3. Failure to Obey a Lawful General Regulation

Appellant was charged with failure to obey a lawful general regulation by failing to register two firearms he kept in his on-base residence. One specification alleged Appellant failed to register a handgun between 1 April 2019 and 25 April 2019. A second specification alleged Appellant failed to register a rifle between 1 January 2019 and 25 April 2019.[12] Evidence showed Appellant failed to register these firearms with the USAFA security forces squadron.

Before trial, Appellant moved to dismiss the charge and its specifications. He argued the regulation at issue, Air Force Instruction (AFI) 31-101, *Integrated Defense*, ¶ 8.4.2.4.1.4 (6 Jul. 2017),[13] was a controlled access publication, and, therefore, Appellant did not have fair notice of what was required of him. To this end, Appellant argued the AFI had not been properly published.[14] Appellant's written motion included a screenshot of an Air Force website (ePubs) that serves as a repository for online publications. That website identified AFI 31-101 as a "restricted access" publication available from the Warehouse Management System (WMS) or the office of primary responsibility (OPR). The military judge denied the motion, ruling that the issue of proper publication was "an issue that can be litigated" at trial and a question of fact for the members to decide.[15] Appellant then contested the question of proper publication before the members.

---

[12] Specifications 1 (handgun) and 2 (rifle) of Additional Charge II.

[13] This paragraph of the Air Force Instruction (AFI) reads in pertinent part, "Registration of POFs [Privately Owned Firearms] is mandatory when stored on the installation. This includes weapons stored in family/privatized housing where the [Air Force] has legal jurisdiction (proprietary, concurrent or exclusive) and the armory."

[14] The AFI states that failure by military personnel to obey the provision in issue is a violation of Article 92, UCMJ, 10 U.S.C. § 892. Appellant does not challenge enforceability insofar as whether the provision is meant to be punitive. We find that it was.

[15] During questioning of the USAFA publications manager, the military judge instructed the members that "[t]he opinion that this witness offered on whether a regulation has been lawfully published is . . . a decision that you're going to have to make." After the close of evidence, he instructed that general regulations are those "generally applicable to an armed force and which are properly published by a military department. 'Publication' occurs when a general regulation is received by the official repository for such publications on base, such as the master publications library. Then, it is available for reference by all base personnel."

We assume for purposes of this appeal that this aspect of the military judge's ruling is correct in that the question whether AFI 31-101 had been properly published is a question of fact for the members to decide. The court, therefore, examines this question as it bears on legal and factual sufficiency of the two convictions under review. *See Washington*, 57 M.J. at 399. We then conclude by separately examining a closely related question of law: whether the military judge abused his discretion by failing to rule that the punitive provision of the AFI at issue could not be enforced against Appellant as a matter of due process of law.

For Appellant to be found guilty of the two offenses at issue, the Government was required to prove beyond a reasonable doubt that: (1) there was in effect a certain lawful general regulation, AFI 31-101; (2) Appellant had a duty to obey it; and (3) Appellant failed to obey the regulation. *See* 2019 *MCM*, pt. IV, ¶ 18.b.(1) (listing elements of Article 92, UCMJ). General regulations are those "generally applicable to an armed force which are properly published by the President or the Secretary of Defense, of Homeland Security, or of a military department . . . ." 2019 *MCM*, pt. IV, ¶ 18.c.(1)(a). An accused's knowledge of a general regulation "need not be alleged or proved as knowledge is not an element of this offense and a lack of knowledge does not constitute a defense." 2019 *MCM*, pt. IV, ¶ 18.c.(d).

On appeal, Appellant renews his contention at trial that the Government failed to prove that the regulation at issue was properly published with respect to the first element of the charged offenses. In support of this claim, Appellant argues that a general regulation must be available for reference by all installation personnel, and the restricted access caveat to AFI 31-101 does not qualify. On this point, Appellant contends that "[t]he record establishes that AFI 31-101 was not available to all base personnel, least of all prior to or during the charged timeframes; thus, it was not properly published." For support, Appellant relies on the testimony of the USAFA Pass and Registration Center (PRC) noncommissioned officer in charge (NCOIC) who was called as a witness in the Government's findings case. The NCOIC testified on cross-examination that he believed Airmen who were not security forces personnel would not normally have access to AFI 31-101. Appellant asks the court to set aside his convictions with respect to these offenses as well as his sentence.

The Government presented testimony at trial of the USAFA Publications Manager, which refuted testimony given by the NCOIC. The Publications Manager explained that ePubs is the official repository for Air Force instructions and that restricted access publications are listed on ePubs with guidance how to access such publications. She further explained that when trying to access a particular restricted publication, a link generates a webpage that has another "link that sends you to WMS, or it will give you an information icon where

you can contact the OPR for access to the publication." She explained that documents on the WMS website are accessible by any personnel with a common access card (CAC), but are not readily accessible to the general public.[16] The Publications Manager testified that AFI 31-101 is listed on ePubs and if someone is attempting to access the AFI, a link directs the user "to the page that states you go to WMS if you have accessibility or to contact the OPR for access" to AFI 31-101. Evidence showed military personnel can access AFI 31-101 through the ePubs link to WMS:

> Q [Trial Counsel]. And through WMS, is it immediately – specifically, AFI 31-101, is it immediately available to a military member?
>
> A [Witness]. Yes.
>
> Q. Are there any special accounts that are required?
>
> A. No.
>
> Q. Any special permissions you need from the OPR?
>
> A. No.
>
> Q. Does the Air Force Academy, specifically, put any other specific restrictions on accessing AFI 31-101?
>
> A. No, sir.

On cross-examination, the publications manager acknowledged she did not attempt to access AFI 31-101 during the charged timeframes.

Next, the Government called a noncommissioned officer who was assigned to the USAFA legal office as an individual mobilization augmentee (IMA) reservist. The IMA described how she recently accessed AFI 31-101 through the ePubs website using her CAC and a government computer.[17] Her testimony

---

[16] The court judicially notes, as background, what would have been apparent to the members and may be inferred from this testimony and other evidence: a common access card (CAC) is "the ID [(identification)] card for uniformed Services personnel," which also "serves as a primary platform for the public key infrastructure authentication token in the unclassified environment used to access the Department[ of the Air Force]'s computer networks and systems." AFI 36-3026, Volume 2, *Common Access Card (CAC)*, ¶ 1.3 (17 May 2018). We are mindful that a Court of Criminal Appeals may "take judicial notice of an undisputed fact . . . that is important to the resolution of an appellate issue, [but] it cannot take judicial notice of facts necessary to establish an element of the offense." *United States v. Paul*, 73 M.J. 274, 280 (C.A.A.F. 2014).

[17] Appellant points out that, "[d]uring discovery trial counsel expressly told the Defense that while the Government was turning over a copy of AFI 31-101, it was doing so with

was consistent with the testimony of the Publications Manager and lent support to the conclusion that AFI 31-101 was properly published:

Q [Trial Counsel]. . . . [W]ere you able to view it?

A [Witness]. Yes, sir.

Q. How did you do that?

A. . . . I put ["]31-101["] into the search bar, and I clicked on "search" on the Air Force ePublishing website. It gave me a list of publications. I clicked on AFI 31-101 and it brought me to a restricted access page. On the restricted access page, there is a link to the WMS site, WMS meaning Warehouse Management System. I clicked on that. It brought me to another link, which I then clicked on, and it brought me to the WMS homepage. Through that, you actually do have to use your CAC -- your military CAC card. You pick the certificate that you want, enter in your PIN, you hit enter, and it brings you to a disclaimer page. You click, "I agree," and, then, it gets you to the WMS homepage. From there, there is a keyword search bar that gives you direction as to how to enter your AFI, for instance, no spaces. I entered ["]AFI 31-101,["] and it brought me to a product page. On the product page, it said, "AFI 31-101, new details." I clicked on "new details," and it brought me to the product detail page, which then told me that AFI 31-101 was available for instant download.

Q. And did you download it?

A. Yes, sir.

Q. Did you save it for later?

A. Yes, sir.

Q. Could you print hard copies?

---

the 'trust that a separate copy' of this 'controlled-access document' would 'not be provided to [Appellant].'" Appellant argues that trial counsel "clearly did not believe that all base personnel were entitled to access AFI 31-101, least of [all] Appellant, the person actually being charged with violating this AFI." We find trial counsel's misunderstanding of the restricted access caveat and the obligation to discover and produce evidence to assist Appellant in his defense has no bearing on the court's determination of legal and factual sufficiency of Appellant's conviction. *See United States v. Reed*, 54 M.J. 37, 43–44 (C.A.A.F. 2000) (stating matters not introduced at trial are outside the record and may not be considered for factual or legal sufficiency on appeal).

A. Yes, sir.

. . . .

Q. Now we briefly talked about the fact that you are an IMA paralegal here at the legal office.

A. Yes, sir.

Q. Do you have any special access to ePubs?

A. No, sir.

Q. Any kind of account that you set up?

A. No, sir.

Q. Any special permissions?

A. No, sir.

Q. When you went to [AFI] 31-101 through the WMS, did you have to request anything from the OPR?

A. No, sir.

On cross-examination, the IMA acknowledged she did not attempt to access AFI 31-101 during the charged timeframes.

The Government also introduced a "Weapon Registration Form," which Appellant had signed on 26 February 2015, about four years before the beginning of the earliest charged timeframe. Appellant signed the form the same day he signed a lease agreement to occupy on-base housing.[18] The exhibit informed residents that "[a]ll firearms must be registered with the Neighborhood Management Office and in accordance with 10th Security Forces [Squadron] at the [United States] Air Force Academy within three (3) days of occupancy or procurement of firearms." It continued, "Failure to adhere to this provision is a material breach of the Lease Agreement." The exhibit listed no firearms that had been registered to Appellant.

The Government called a witness who was familiar with Appellant's records maintained at the housing office. The witness explained the Weapon Registration Form that Appellant had signed is the same form that "would have been provided at move-in for anyone who has or will get weapons within their homes." The witness acknowledged the exhibit came from Appellant's housing office file. The witness explained that a form that lists firearms is not filed with the housing office until the resident has already complied with the security

---

[18] The Government also introduced evidence of signs posted at installation entry points that generally warned of firearm restrictions on the installation.

forces squadron's process for registering a firearm. In Appellant's case, if he had properly registered a weapon it would have been reflected on his Weapon Registration Form on file with the housing office. In that regard, the witness testified,

> [T]he purpose of this form is to ensure that [residents] are in accordance with the base policy as well. So, this form is returned to us with the weapons information on it. The form that we currently are using does have a space for security forces to also acknowledge that they have received the information from the resident.

Direct evidence shows Appellant was well aware of firearm registration requirements at the USAFA. In March 2019 he told KM he had to hide the Glock handgun he had just purchased because it was not registered with the installation. During his testimony in findings, Appellant acknowledged he was aware of his duty to register his firearms. He even "had the paperwork" to complete the process. He acknowledged "it was a housing requirement to register [a firearm] on base." He confirmed "it was a base requirement to register it," explaining, "That's the brief that you're given once you obtain the house." In his own words, he "had a duty to register" personal firearms that he kept in on-base housing, only he had not done so.

The court finds Appellant's convictions legally and factually sufficient. In this regard, a rational factfinder could conclude that AFI 31-101 was properly published and that it was in effect during the relevant periods. We reach this conclusion for the reasons that follow. First, the USAFA Publications Manager explained that ePubs is the official repository for Air Force instructions. Second, both the Publications Manager and the IMA testified that the AFI was listed on ePubs. Third and significantly, the Publications Manager further explained that the AFI was accessible to all military personnel using CAC credentials. In this regard, the "restricted access" caveat excluded only those persons from examining the AFI on ePubs who could not be charged under Article 92, UCMJ, with its violation.[19] Fourth, a rational factfinder could infer from

---

[19] Appellant asserts that not all persons have access to AFI 31-101, *Integrated Defense*, (6 Jul. 2017), notably, for example, "military dependents, [and] certain contractors who work full-time on base." We find this point inapt because, under the express terms of the AFI, only "military personnel" are subject to disciplinary action under Article 92, UCMJ, for failure to obey the AFI's punitive provisions, including the one at issue.

evidence in the record that an instruction dated 6 July 2017 was properly published within the *nearly two years* preceding the earliest charged timeframe in 2019.[20]

As to this fourth point, when examining evidence in a light most favorable to the Prosecution, we accept that "a rational factfinder[ ] could use his 'experience with people and events in weighing the probabilities' to infer beyond a reasonable doubt" that an element was proven. *Long*, 81 M.J. at 369 (quoting *Holland*, 348 U.S. at 140). At the same time, the regulation at issue "is entitled to a presumption of regularity if it appears regular on its face." *United States v. Ayers*, 54 M.J. 85, 91 (C.A.A.F. 2000). A rational factfinder could find no reason to question that AFI 31-101 was regular on its face, and could infer beyond a reasonable doubt that it was a lawful general regulation that was properly published and in effect during the relevant periods. *See United States v. Tolkach*, 14 M.J. 239, 244 (C.M.A. 1982) (concluding that publication "occurs when a general regulation is received by the official repository"). A rational factfinder could also infer that once the AFI had been put into effect, it had not been rescinded before or during the charged timeframes, and therefore, was still in effect when Appellant failed to register his firearms.

Evidence of proper publication, moreover, is evident from the housing office's implementation of the firearm registration provision. *See id.* at 242 (observing "there must be a point where there has been sufficient publication to give rise to a presumption of knowledge"). Evidence of proper publication may be inferred from the fact that the housing office required residents to comply with firearm registration requirements "in accordance with 10th Security Forces at the [United States] Air Force Academy," as stipulated in the Weapon Registration Form Appellant signed. In addition to written notice provided to Appellant when he moved into base housing, testimony shows it was the housing office's policy to brief residents that they must register their firearms with USAFA security forces. Appellant's own testimony indicates that he received such a brief, and so it may be inferred that the responsibility he had to register

---

[20] The military judge took judicial notice of AFI 31-101, explaining the members were permitted to recognize and consider the instruction "without further proof." However, the military judge did not take judicial notice that the AFI was properly published. The military judge also took judicial notice of a USAFA regulation, which stated that ePubs is "the official repository for department, command, and field publications and forms that are issued at the wing/base and above." A general order is a proper subject of judicial notice. *See United States v. Wales*, 31 M.J. 301, 309 (C.M.A. 1990); *see also United States v. Boyett*, 42 M.J. 150, 153–54 (C.A.A.F. 1995) (stating it is appropriate to take judicial notice of service regulations).

his firearms, of which he had actual knowledge, was predicated on the implementation of a properly published AFI 31-101, or antecedent, as opposed to some other standard or source of duty independent of the regulation at issue.

To this end, the Weapon Registration Form and briefing Appellant received conform to provisions in the lawful general regulation at issue. *See* AFI 31-101, ¶ 8.4.2.4.2.4 (authorizing installation commanders to require, as part of the lease agreement, a signed acknowledgement of security instructions regarding privately owned firearms by all persons assigned family quarters); *see also* ¶ 8.4.2.4.2 ("Installation Commanders shall ensure security instructions are given widest dissemination, and procedures established to inform all personnel assigned to or visiting the installation, of installation guidance on POFs [privately owned firearms].").[21] Importantly, the USAFA Publications Manager testified the AFI was accessible to any military personnel with a CAC.[22] Consequently, we find direct and circumstantial evidence shows the specific provision at issue was accessible by all military personnel and therefore "available for reference by all base personnel," *Tolkach*, 14 M.J. at 244, and was known by Appellant despite the restricted access caveat.

Appellant contends that the Government was required to prove he had a CAC that "was in working order" with the requisite "certificates . . . to access WMS [(Warehouse Management System)]." He also argues, "It makes no difference whether Appellant was subjectively aware of this AFI's requirement to register firearms." We disagree with both points. The elements of the offense do not require the Government to prove beyond a reasonable doubt that Appellant had the means to access the AFI using his CAC. Rather, the Government's burden was to show that there was in effect a certain lawful general regulation. This was shown most directly by the USAFA Publications Manager who explained that members could access the AFI using a CAC. It was also shown circumstantially from other evidence including Appellant's own testimony. In this regard, evidence Appellant knew he had a duty to register his personal firearms makes it more probable than not that AFI 31-101 was properly published, that it was in effect during the charged timeframes, and that Appellant had a duty to obey it. Drawing every reasonable inference from the testimony in favor of the Government, *Barner*, 56 M.J. at 134, we find ample proof that

---

[21] This and related guidance is now contained in Department of Defense Manual 5100.76, *Physical Security of Sensitive Conventional Arms, Ammunition, & Explosives (AA&E)*, para 8.c (20 Feb. 2020) ("Installation Commanders shall ensure security instructions are given widest dissemination, and procedures established to inform all personnel assigned to or visiting the installation, of installation guidance on POFs.").

[22] In reference to AFI 31-101, trial counsel asked the witness, "So it's accessible to any member with a Common Access Card?" The witness replied, "Yes, sir."

exceeds "some competent evidence," *Wilson*, 6 M.J. at 215, to support Appellant's convictions for failing to obey a lawful general regulation beyond a reasonable doubt. We are also convinced beyond a reasonable doubt of Appellant's guilt. Thus, we find both convictions legally and factually sufficient.

Lastly, we turn to examine whether the military judge abused his discretion by failing to grant Appellant's pretrial motion that the AFI provision at issue could not be enforced against him as a matter of due process of law. The question of enforceability appears to be similar to, and yet distinct from, the question of legal sufficiency. *See Tolkach*, 14 M.J. at 240 (addressing whether the general regulation in that case had been properly published so as to be "valid and enforceable" and, if not, whether it "constitutes a denial of due process" of law). To this end, in *Tolkach*, the court did not ask *whether any rational trier of fact* could have found the regulation at issue was properly published, and thus enforceable against that appellant. *See*, *e.g.*, *Robinson*, 77 M.J. at 297–98 (stating standard for legal sufficiency). Rather, the court examined the question of "proper publication" to determine if there was "a violation of constitutional due process." *Tolkach*, 14 M.J. at 241. The court did so without deference to the factfinder and the "very low threshold to sustain a conviction" when a court conducts its legal sufficiency review. *King*, 78 M.J. at 221 (stating the standard for legal sufficiency review "impinges upon jury discretion only to the extent necessary to guarantee the fundamental protection of due process of law" (internal quotation marks omitted) (quoting *Jackson*, 443 U.S. at 319)).

For the reasons set forth in our analysis of legal and factual sufficiency, on this record we find that AFI 31-101 was shown to be valid and enforceable and thus binding upon Appellant as a matter of due process of law.[23] *Tolkach*, 14

---

[23] Our dissenting colleague finds it significant that the date of the Weapon Registration Form, and the date Appellant signed the form, 26 February 2015, predate the issuance of AFI 31-101 by over two years. We judicially note that the registration requirement for privately owned firearms during the charged timeframe was in effect before 26 February 2015. *See United States v. McCormick*, No. ACM 38743, 2016 CCA LEXIS 384, at *2 (A.F. Ct. Crim. App. 23 Jun. 2016) (unpub. op.) (observing that "Air Force Instruction (AFI) 31-101, *Integrated Defense*, ¶ 8.4.2.4.1.1 (2013), requires that privately-owned firearms stored on Air Force installations be registered with Security Forces"). This tends to show that AFI 31-101 was properly published so as to be valid and enforceable as a matter of due process of law, *United States v. Tolkach*, 14 M.J. 239, 240 (C.M.A. 1982), which as stated in our opinion, appears to be a different issue than legal sufficiency of the evidence. Separate from the question of enforceability under *Tolkach*, our assessment of the legal sufficiency of evidence upon which Appellant was convicted is limited to the evidence produced at trial that was before the trier of fact. *See United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993).

M.J. at 241. We find the military judge did not abuse his discretion by denying Appellant's motion to dismiss. To reach this conclusion, we credit the testimony of the USAFA Publications Manager that AFI 31-101 was accessible to any member with a CAC over the testimony of the PRC NCOIC.[24] Appellant's constructive knowledge of the provision at issue, moreover, can be conclusively presumed in line with his actual knowledge of what was required of him. Thus, we conclude the military judge did not err in denying Appellant's pretrial motion that claimed the AFI was not enforceable as a general regulation on the bases that it was not properly published and Appellant was deprived of fair notice. In view of this conclusion and our finding Appellant's convictions legally and factually sufficient, we decline to grant the relief he requests on appeal.[25]

## B. Cross-Examination of Appellant

Appellant contends that trial counsel improperly cross-examined Appellant when he testified in his own defense by confronting Appellant with the assertion that he had attended a domestic violence treatment program. Appellant argues this line of questioning elicited character evidence inadmissible under Mil. R. Evid. 404(b)(1). Appellant also contends that it was improper for trial counsel to question Appellant about the mechanism of injury to KM, specifically whether his testimony was consistent with the opinion of an expert witness called by the Government in its case-in-chief. Appellant claims this line of questioning elicited opinion testimony under Mil. R. Evid. 701 and 702 that Appellant was not qualified to give. In a related claim, Appellant contends that trial defense counsel were constitutionally ineffective for failing to object to both lines of questioning. Appellant requests the court set aside his convictions for Charge II and the seven specifications of assault consummated by a battery, and to set aside the sentence.

---

[24] "Unlike most intermediate appellate courts and [the Court of Appeals for the Armed Forces (CAAF)], the Court of Criminal Appeals has factfinding powers." *United States v. Cendejas*, 62 M.J. 334, 342 (C.A.A.F. 2006) (citing Article 66, UCMJ, 10 U.S.C. § 866).

[25] In reply to the Government's answer, Appellant asserts that "the very act this restricted access regulation proscribes is otherwise understood to be a fundamental right and constitutional guarantee in other contexts." For authority, Appellant cites *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (reiterating that the "central holding" of the United States Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), is "that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home"). We find *McDonald* and *Heller* inapt as to the legal and factual sufficiency of the convictions under review. Neither case recognizes a right to refrain from registering personal firearms kept on a military installation in contravention to a military duty.

As discussed next, the court finds Appellant forfeited claims that trial counsel's questioning of Appellant was improper by failing to object at trial and that Appellant has not met his burden to demonstrate plain error. The court likewise finds Appellant has failed to show that trial defense counsel were constitutionally deficient by failing to object to trial counsel's questions put to Appellant on cross-examination.

**1. Law**

### a. Character Evidence

"[A]n accused's character generally is not in issue at trial." *United States v. Trimper*, 28 M.J. 460, 467 (C.M.A. 1989) (citing Mil. R. Evid. 404(a)(1)). However, an accused "may offer evidence of the accused's pertinent trait and, if the evidence is admitted, the prosecution may offer evidence to rebut it." Mil. R. Evid. 404(a)(2)(A). "[T]he legal function of rebuttal evidence[ ] '. . . is . . . to explain, repel, counteract or disprove the evidence introduced by the opposing party.'" *United States v. Saferite*, 59 M.J. 270, 274 (C.A.A.F. 2004) (last omission in original) (quoting *United States v. Banks*, 36 M.J. 150, 166 (C.M.A. 1992) (additional citation omitted)). "The scope of rebuttal is defined by evidence introduced by the other party." *Banks*, 36 M.J. at 166. "Rebuttal evidence, like all other evidence, may be excluded pursuant to [Mil. R. Evid.] 403 if its probative value is substantially outweighed by the danger of unfair prejudice." *Saferite*, 59 M.J. at 274.

Appellant cites Mil. R. Evid. 404(b)(1), which prohibits evidence of a crime, wrong, or other act "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." On request by an accused, the rule requires trial counsel to give the defense "reasonable notice of the general nature of any such evidence that the prosecution intends to offer at trial." Mil. R. Evid. 404(b)(2)(A). Notice is generally required before trial, but may be given "during trial if the military judge, for good cause, excuses lack of pre-trial notice." Mil. R. Evid. 404(b)(2)(B).

### b. Plain Error Standard of Review

When an accused testifies in his own defense and the Defense fails to object to questions on cross-examination, a claim of error will be forfeited in the absence of plain error. *United States v. Ruiz*, 54 M.J. 138, 143 (C.A.A.F. 2000). "A timely and specific objection is required so that the [trial] court is notified of a possible error, and so [that the military judge] has an opportunity to correct the error and obviate the need for appeal." *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (citation omitted). Under plain error review, an appellant "has the burden of establishing (1) error that is (2) clear or obvious and (3) results in material prejudice to his substantial rights." *United States v. Lopez*,

76 M.J. 151, 154 (C.A.A.F. 2017) (internal quotation marks and citations omitted). "The plain-error doctrine 'is to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" *Ruiz*, 54 M.J. at 143 (quoting *United States v. Frady*, 456 U.S. 152, 163 n.14 (1982)).

### c. Effective Assistance of Counsel

The Sixth Amendment guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk,* 52 M.J. 312, 315 (C.A.A.F. 2000)).

Allegations of ineffective assistance of counsel are reviewed de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza,* 67 M.J. 470, 474 (C.A.A.F. 2009)). "To prevail on an ineffective assistance claim, the appellant bears the burden of proving that the performance of defense counsel was deficient" and that this deficiency resulted in prejudice. *United States v. Captain*, 75 M.J. 99, 103 (C.A.A.F. 2016) (citing *Strickland*, 466 U.S. at 698). Accordingly, we consider "(1) whether counsel's performance fell below an objective standard of reasonableness, and (2) if so, whether, but for the deficiency, the result would have been different." *United States v. Gutierrez*, 66 M.J. 329, 331 (C.A.A.F. 2008) (citations omitted).

When evaluating the performance of counsel, we employ a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Because counsel are presumed competent, an appellant must rebut this presumption by showing specific errors that "were unreasonable under prevailing professional norms." *United States v. Scott*, 24 M.J. 186, 188 (C.M.A. 1987) (citation omitted). In effect, this requires a "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *United States v. Dewrell*, 55 M.J. 131, 133 (C.A.A.F. 2001) (citations omitted). Failure to pursue a particular legal claim, however, is not necessarily deficient conduct by counsel. "If that claim is not shown to have a reasonable probability of being found meritorious as a matter of law and fact, the failure to pursue it is not error and certainly not ineffective assistance of counsel." *United States v. Terlep*, 57 M.J. 344, 349 (C.A.A.F. 2002).

### 2. Cross-Examination on Domestic Violence Treatment

#### a. Appellant's Testimony

At trial, Appellant testified in his own defense. His direct examination opened with trial defense counsel eliciting blanket denials from Appellant as

to offenses of which AJ and KM were named as victims. Appellant answered his attorney's questions about whether he committed a particular act charged in each of the seven assault consummated by a battery specifications with, "No, sir. I did not." By the end of direct examination, Appellant denied he had committed those offenses, again repeating, "No, sir. I did not," each time trial defense counsel asked him about charged conduct. Specifically with regard to charged offenses against his spouse, AJ, in May 2017, Appellant denied grabbing her by the arm and dragging her out of their son's bedroom, he denied shoving her between the washer and dryer, and he denied grabbing her by the neck with his hands and strangling her.

In response to other trial defense counsel questions on direct examination, Appellant testified about efforts he made to improve communication in his marriage. He explained his relationship with AJ "wasn't what you call the best," and was more "like a roller coaster ride, up and down, up and down." The problems "got to a point where [Appellant] . . . began to look up resources in regards to improving the marriage." Trial defense counsel asked if Appellant and AJ "h[ad] a conversation based on [his] research." Appellant answered in the affirmative, explaining his research led him to conclude that the solution was "to improve communication." In Appellant's telling, the "tactic" he tried to convey to AJ was for each of them "to lay out boundaries" and things that upset them about the other. On further questioning, Appellant acknowledged he "talked with [AJ] specifically about being called a b[**]ch," explaining it was disrespectful and "something that upsets [him]." The conversation took place before the incident in May 2017 that began in their son's bedroom.

In response to questions put to him by trial defense counsel, Appellant relayed that during that incident AJ had called him a "b[**]ch," "like two or three times," and "[i]t kind of escalated each time." Appellant acknowledged AJ was "yelling" and "cussing" at him, so he "grabbed her by her shoulders and pushed her out of the room." He explained he "didn't want [his] son to be witnessing anything like that. We never try to -- well we always tried to keep stuff like that out of his line of sight." Once they were in the hallway by the washer and dryer, Appellant told her, "Are you 'F'-ing serious? We just had this conversation." By conversation, Appellant acknowledged he was referring to the conversation where AJ got in his "face and call[ed] [him] a b[**]ch."

On cross-examination, trial counsel sought to impeach Appellant by relating the assaults of both victims to Appellant's inability to harness his anger. Trial counsel began this line of inquiry by asserting that Appellant had "talked about losing [his] temper before" and asked, "You have admitted . . . and acknowledged that you have anger problems, right?" Appellant replied, "We're human. Everyone has an -- emotions." Trial counsel then confronted Appellant with what trial counsel said were recorded phone calls between Appellant and

KM in which they discussed that Appellant should attend anger management counseling. Trial counsel asked Appellant to recall if he told KM that he agreed it would be a "good idea" for him to attend such counseling. Appellant testified he did not recall making that statement to KM.

Trial counsel again challenged Appellant's testimony, this time confronting him about his commitment to improving communication in his marriage as a means to deescalate conflict as he had alluded to on direct examination. In this regard, trial counsel sought to have Appellant admit that he attended a domestic violence treatment program, but he quit the program before it was finished. The following exchange includes the line of questioning that Appellant challenges for the first time on appeal:

> Q [Trial Counsel]. [I]n the course of your marriage with [AJ] -- you did go to counseling for [anger management], right?
>
> A [Appellant]. I went to mental health, yes, sir.
>
> Q. No, anger counseling?
>
> A. I went to mental health, sir.
>
> Q. You were . . . sent to go to domestic violence treatment, right?
>
> A. In regards to [AJ]'s allegations, yes, sir.
>
> Q. Yeah. So you were sent to domestic violence treatment?
>
> A. Yes, sir. Due to the allegations.
>
> Q. This was prior to [KM] ever even coming in the picture, right?
>
> A. That's correct.
>
> Q. Okay. And part of that treatment would be anger management counseling, right?
>
> A. I don't recall the anger management portion, but I did see mental health.
>
> Q. I'm talking about the domestic violence treatment.
>
> A. Well, sir, you also asked in regards to anger management and mental health ----
>
> Q. I understand that.
>
> A. ---- so I agreed to the mental health.
>
> Q. So I'll -- let me narrow it for you. The domestic violence treatment you went to, a portion of that is how to control your anger, right?

A. Well in regards to that, from what I can remember, she was just talking about how to improve couple relationships, I guess.

Q. Okay. And so the point of this treatment program is how to repair your marriage, right?

A. I don't fully recall. It's been a while, sir.

Q. Okay. But, generally, you remember the gist of it?

A. The gist of it was just to kind of talk about marriage in general.

Q. Okay. So that you would not be an abusive partner?

A. So there would be no kinds of acts of such between the couple.

Q. Okay. *And you quit that program before it was finished, right?*

A. *I don't recall.*

(Emphasis added). Later in cross-examination, trial counsel again probed Appellant's commitment to participating in counseling to improve his marriage. Appellant acknowledged "looking up resources" on his own, and he did so "[t]o improve the marriage." This exchange followed:

Q [Trial Counsel]. Okay. But you quit the domestic violence program, right?

A [Appellant]. I never quit.

Q. You never completed it?

A. I didn't complete it, but neither did I quit.

After questioning by both counsel was complete, a panel member asked "when did [Appellant] go to domestic violence counseling? What incident, if any, triggered the counseling, and was it a self-referral or mandated?" Trial defense counsel objected citing Mil. R. Evid. 402 and 403, explaining he did "not believe that any further inquiry into [Appellant]'s counseling [wa]s relevant." Trial counsel took "no position on" the last two parts of the question, but argued the first part was "relevant because the purpose of the cross[-examination], and what was elicited, was to impeach [Appellant] on the timeline he gave as far as [Appellant] working on the marriage and being interested in preserving the marriage and this type of thing." The military judge sustained the objection to the member's question, citing Mil. R. Evid. 403 and the inadmissibility of subsequent remedial measures under Mil. R. Evid. 407.

### b. Trial Defense Counsel Responses to "Domestic Violence Treatment"

As a result of Appellant's claims that he received constitutionally ineffective assistance from trial defense counsel, the court ordered and received declarations from both counsel.[26] We have considered whether a post-trial evidentiary hearing is required to resolve any factual disputes and are convinced such a hearing is unnecessary. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997); *United States v. DuBay*, 37 C.M.R. 411, 413 (C.M.A. 1967) (per curiam).

The lead trial defense counsel conducted the direct examination of Appellant. He did not object to questions put to Appellant on cross-examination about Appellant's participation in "domestic violence treatment" as part of a defense strategy to show that Appellant did not have anything to hide. The lead counsel explained this approach "would contrast with the two victims, who had been hiding things throughout." Additionally, the lead counsel believed members would consider such participation neither "strange" nor "unusual" when an Airman is accused of domestic violence by a partner.[27] The lead counsel recalled the line of questioning "as being insignificant in how it came out at trial." He explained, "At the time, the . . . questioning did not seem very strong or confident, and the [trial counsel] seemed to be grasping at something that was not there." Appellant "was also doing well on the stand, so the need to object was not significant strategically."

### c. Analysis

Appellant claims evidence that Appellant was "treated" for domestic violence alerted the members, in violation of Mil. R. Evid. 404(b)(1), that he "was precisely the type of person who would commit the charged acts especially given that he failed to complete his treatment." For support, Appellant draws the court's attention to a member's question after trial counsel's line of inquiry that sought details about Appellant going to domestic violence counseling. In reply to the Government's answer, Appellant makes the additional argument

---

[26] On 22 July 2021 the court granted the Government's motion to order trial defense counsel to provide an affidavit or declaration to the court that was responsive to Appellant's claim that trial defense counsel were constitutionally ineffective in their representation of Appellant. Appellant moved the court for reconsideration of that order, with a suggestion for en banc reconsideration, which the court denied on 10 August 2021. Appellant petitioned the CAAF for extraordinary relief in the nature of a writ of prohibition or, in the alternative, a writ of mandamus, which was denied on 15 September 2021. *United States v. Jackson*, 82 M.J. 19 (C.A.A.F. 2021) (mem.).

[27] The co-counsel shared this view, stating "[i]t came across in court as something Appellant was required to do just based simply on the fact that allegations had been raised, not that they had been substantiated by any means."

that there is no reference to any counseling or treatment in Appellant's direct examination. Appellant also asserts in reply that the "domestic violence treatment" program that trial counsel referenced on cross-examination only "came about *after* AJ made her allegations in December 2018 when they were already separated," and by that time, the "alleged charges involving AJ had already occurred over 18 months beforehand . . . before [the marriage] was broken."

We are not persuaded that Mil. R. Evid. 404(b)(1) is the correct rule to decide this matter. Instead, we look to Mil. R. Evid. 404(a)(2)(A), which governs situations where an accused offers evidence of his character. We also look to the law of impeachment by contradiction. *See, e.g., United States v. Sojfer*, 47 M.J. 425, 427 (C.A.A.F. 1998). This method of impeachment "involves showing the tribunal the contrary of a witnesses' asserted fact, so as to raise an inference of a general defective trustworthiness." *United States v. Banker*, 15 M.J. 207, 210 (C.M.A. 1983) (first citing 3A John H. Wigmore, *Evidence* § 1000 (Chadbourne rev. 1970); and then citing Charles T. McCormick, *McCormick's Handbook of the Law of Evidence* § 47 (E. Cleary 2d ed. 1972)).

The challenged line of questioning had its origin in responses Appellant gave to trial defense counsel questions when he testified in his own defense. Appellant explained how he took the initiative to find resources to improve communication in his marriage. The implication of his testimony was that AJ was verbally aggressive and behaved inappropriately in their son's bedroom and, at the same time, Appellant attempted to deescalate the situation by removing AJ from the room. A logical inference from Appellant's direct examination is that it was less probable he was the aggressor in the May 2017 incident with AJ in their son's bedroom because, mindful of the resources he took the initiative to discover, Appellant was sensitive to avoiding a conflict escalation in his marriage.

Appellant's testimony about initiatives he said he took to avoid conflict with AJ opened the door to challenge on cross-examination. The court reaches this conclusion because Appellant's testimony on direct examination could be relevant only because of its tendency to show that he did not commit the charged assaults against AJ that began in their son's bedroom. Whether or not Appellant understood it at the time, that testimony put what he believed to be a pertinent character trait before the members, namely, that the factfinder should believe he was not the type of person who would escalate conflict in a relationship or engage in the conduct charged by the Government. *See* Mil. R. Evid. 404(a)(2)(A) (accused may offer a "pertinent trait" as an exception to the general rule that evidence of character is inadmissible).

As observed by our superior court's predecessor, "[T]he price a defendant must pay for attempting to prove his good name is to throw open the entire

subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him." *United States v. Tomchek*, 4 M.J. 66, 71 (C.M.A. 1977) (internal quotation marks omitted) (citing *Michelson v. United States*, 335 U.S. 469, 479 (1948)). An "accused who elects to testify is subject to impeachment just like any other witness." *United States v. Stroh*, 46 M.J. 643, 648 (A.F. Ct. Crim. App. 1997). Unlike other witnesses, an accused's testimony may be viewed with the clear purpose to raise reasonable doubt as to guilt. In this regard, an accused assumes responsibility not only for the evidence he introduces, but also for the reasonable inferences that may be drawn from that evidence. *See United States v. Shields*, 20 M.J. 174, 176 (C.M.A. 1985); *United States v. Strong*, 17 M.J. 263, 266 (C.M.A. 1984). This court is not inclined to take a dismissive approach to the efforts Appellant said he made to improve communication in his marriage or discount the significance of those efforts to his defense when they were laid before the trier of fact.

It follows that Appellant's sincerity and commitment to constructive conflict resolution were grounds for rebuttal by trial counsel. Mil. R. Evid. 404(a)(2)(A) ("[A]ccused may offer evidence of the accused's pertinent trait and, if the evidence is admitted, the prosecution may offer evidence to rebut it."); *see also Banks*, 36 M.J. at 166 ("It is well settled that the function of rebuttal evidence is to explain, repel, counteract or disprove the evidence introduced by the opposing party."). In this regard, the Government explains that evidence Appellant had not completed a counseling program was proper rebuttal. As the court understands the Government's argument, the line of inquiry undermined Appellant's credibility because it tended to disprove a trait that Appellant felt important enough to offer during his direct examination: it demonstrated Appellant was not so dedicated to avoiding conflict in his relationship with AJ that he could not have been the aggressor in the May 2017 incident in their son's bedroom.

For reasons discussed next, the court is satisfied with this explanation and finds the challenged line of questioning was not shown to be irrelevant, Mil. R. Evid. 401 and 402, or unduly prejudicial, Mil. R. Evid. 403, under a plain error standard of review. *See Lopez*, 76 M.J. at 154. Having determined both logical relevance and an admissible purpose for the questions, the court is not persuaded that Mil. R. Evid. 404(b) applies in this context.[28] *See United States v.*

---

[28] We likewise reject Appellant's claim of plain error in that trial counsel's cross-examination of Appellant "amounted to character evidence which should only have been allowed upon proper notice citing a legitimate, nonpropensity purpose" under Mil. R. Evid. 404(b). Mil. R. Evid. 404(a) and impeachment by contradiction are the applicable evidentiary rules to resolve the assignment of error, and not Mil. R. Evid. 404(b). We find Appellant has not shown error in trial counsel's failure to provide notice.

*Sullivan*, 70 M.J. 110, 115 (C.A.A.F. 2011) (concluding "the right to cross-examine is the right to question where the proffer establishes a real and direct nexus to a fact or issue at hand").

Turning first to Mil. R. Evid. 401 and 402, we are not persuaded by Appellant's argument on appeal that there was minimal relevance that he had quit or not completed the program, because he was living separate and apart from AJ at the time. We are not convinced of this argument for two reasons.

First, irrespective of their separate living arrangements, evidence showed Appellant was still married to AJ and they had shared physical custody of their son. The trier of fact could conclude that Appellant had no less incentive to benefit from constructive conflict resolution skills whether they were living together or apart. We reach this conclusion because evidence in the record showed that Appellant was provoked in mid-May 2017 when he deliberately blocked AJ from saying goodnight to their son. In Appellant's telling, the purpose of the program was "[s]o there would be no kinds of acts of such between the couple." Under the circumstances, we find no logical reason to suppose that conflict would dissipate with regard to issues involving their son after their living arrangements changed.

Second, at the time Appellant declined to participate in the program he was in an intimate living arrangement with KM. The trier of fact could conclude that Appellant had the same incentive to work on constructive conflict resolution techniques as he did when he quit the program because, again, he was residing with an intimate partner with whom he shared a residence where his young son also resided. For these reasons, Appellant's argument does not persuade the court that the challenged line of questioning was logically unsound under a plain error standard of review, or otherwise.

Appellant does not challenge *legal* relevance of the line of questioning under Mil. R. Evid. 403 on appeal.[29] *See*, *e.g.*, *United States v. Hamilton*, 77 M.J. 579, 586 (A.F. Ct. Crim. App. 2017) (observing "Mil. R. Evid. 403 addresses 'legal relevance' and provides that 'evidence' may be excluded notwithstanding its logical relevance"). We address it nonetheless. Because there was no objection at trial, the court applies Mil. R. Evid. 403 for the first time. When assessing prejudice in this context, we ask whether Appellant has shown it was clear or obvious that the probative value of this line of inquiry was substantially outweighed by the danger of unfair prejudice to Appellant. Mil. R. Evid.

---

[29] Appellant's brief does not address Mil. R. Evid. 403 in relation to trial counsel's line of inquiry. Still, Appellant brings to the court's attention that the military judge relied on Mil. R. Evid. 403 to sustain Appellant's objection to a member's question that sought details about Appellant attending domestic violence counseling. As noted earlier in this opinion, Appellant cited Mil. R. Evid. 402 and 403 as bases for that objection.

403; *see generally Lopez*, 76 M.J. at 154. In this regard, we are wary to find clear legal error *sua sponte* in our application of a balancing test meant for the trial judge's discretionary exclusion of logically relevant evidence. This is because the plain error rule is invoked "sparingly" in exceptional circumstances where it is necessary to avoid a "miscarriage of justice." *Frady*, 456 U.S. at 163 n.14, *quoted in Ruiz*, 54 M.J. at 143.

Upon reviewing trial counsel's cross-examination of Appellant, we cannot say, even with benefit of hindsight, that it was clear or obvious error for the military judge to allow trial counsel's impeachment of Appellant. True, the questioning could have had some prejudicial effect because it might suggest a propensity for domestic violence. However, the testimony came on cross-examination and rebutted the Defense's direct examination that was intended by him to be exonerating. Under those circumstances, the factfinder could realize the questioning was meant to challenge Appellant's credibility and counter a character trait which Appellant himself opened the door to by advancing the trait on direct examination. Additionally, the weight of any prejudice under Mil. R. Evid. 403 was somewhat diminished by the military judge's instruction after the close of evidence that "an accused can only be convicted based upon the evidence before the court and not on evidence of a general criminal disposition."

Thus, Appellant has not shown trial counsel's line of questioning was either logically or legally irrelevant under a plain error standard of review. We also find that Appellant has likewise not rebutted the strong presumption that trial defense counsel were not constitutionally deficient in failing to object as Appellant contends that they were on appeal. *See Strickland*, 466 U.S. at 689; *Scott*, 24 M.J. at 188. Having failed to show clear or obvious error, Appellant likewise fails in his burden to demonstrate an error "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Dewrell*, 55 M.J. at 133; *see also United States v. Schmidt*, 82 M.J. 68, 74 n.2 (C.A.A.F. 2022) (Sparks, J., announcing the judgment of the court) ("Appellant's failure to show plain error is fatal to his ineffective assistance of counsel claims.").

Appellant's failure to demonstrate clear or obvious error is "fatal to a plain error claim." *United States v. Bungert*, 62 M.J. 346, 348 (C.A.A.F. 2006). However, we would not grant relief even if the court were to assume for purposes of analysis that Appellant has shown clear or obvious error or that trial defense counsel were deficient by failing to object. In the context of claimed material prejudice from improper testimony, "the appellant 'must show a reasonable probability that, but for the error, the outcome of the proceeding would have been different.'" *Lopez*, 76 M.J. at 154 (quoting *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016)). Appellant has not done so.

The court concludes that the challenged line of questioning was harmless despite trial counsel's use of the phrase "domestic violence treatment" when confronting Appellant about his sincerity and commitment to constructive conflict resolution. Several factors lead us to this conclusion. We give some weight to the views of trial defense counsel in their declarations, which reflect that Appellant's participation was a result of "[AJ]'s allegations," and because he was required to attend. Additionally, as noted above, the military judge instructed the members that "an accused can only be convicted based upon the evidence before the court and not on evidence of a general criminal disposition." On this point, we find it instructive that if the members had considered Appellant's testimony as evidence of propensity to commit domestic violence, and given it significant weight, such use would not explain the mixed findings. *See United States v. Short*, 77 M.J. 148, 151 (C.A.A.F. 2018) (explaining mixed findings "indicate the court members were capable of and did put aside the inadmissible evidence, and Appellant suffered no prejudice"). The members acquitted Appellant of attempting to murder KM, communicating two separate threats to KM, two assaults consummated by a battery upon KM, and one assault consummated by a battery upon AJ. As for the findings of guilty, we agree with the Government about the strength of the evidence the members could rely on to convict. In this regard, the testimony given by AJ and KM was corroborated by pictures each victim took of their injuries almost immediately after they were inflicted.

Considering the totality of the findings evidence, the members readily could have discounted Appellant's repeated denials that any conduct on his part could have caused injury to AJ or KM.[30] The court finds Appellant has failed to show prejudice from the claimed error under a plain error standard of review, *Lopez*, 76 M.J. at 154, or that "but for the [claimed] deficiency, the result would have been different" under the standard for constitutionally deficient assistance of counsel. *Gutierrez*, 66 M.J. at 331. Rather, we are confident that the members used the challenged line of inquiry to determine the weight they should give to Appellant's testimony on direct examination and that it was not used to evaluate propensity to commit domestic violence as claimed.

---

[30] The members were also aware Appellant admitted to lying to law enforcement. Trial counsel asked Appellant, "So you have lied to law enforcement before, correct?" Appellant responded, "In regards to my relations with [KM], yes, sir." Trial counsel followed with this question: "[B]esides your lie . . . regarding the relationship, you're telling us you've never lied to . . . any law enforcement?" Appellant answered, "I gave them the best ability of my truth."

### 3. Cross-Examination on Causes of KM's Injuries

#### a. Testimony of Forensic Nurse Examiner

The Government presented testimony of the nurse who examined and treated KM. Evidence showed the nurse conducted her examination within 24 hours of the acts charged in the three specifications alleging assaults consummated by a battery upon KM. At trial, and without objection, the nurse was recognized as an expert in the field of forensic nursing. The nurse also testified as a fact witness with regard to her personal knowledge obtained from the examination she conducted of KM. During her testimony, she authenticated the electronic record of the medical examination and referenced pictures of KM's injuries that were admitted into evidence at trial.

The nurse testified about injuries that the Government alleged were the result of Appellant having grabbed KM's neck and torso, strangled her, and covered her nose and mouth. The nurse testified that KM had "reported a headache, neck pain, and odynophagia, which is painful swallowing." Pictures showed petechiae on KM's neck, which happens when "small blood vessels rupture[e] under the skin" and, based on those pictures, she concurred that petechiae were present. Another picture showed "a bruise or dried blood on the lip." The nurse found "two linear abrasions" on KM's neck and a "subconjunctival hemorrhage" in the right eye, all of which were documented during the exam. She concluded the physical force necessary to cause the "abrasion" could "be a scraping, it could be a grabbing, [and] it could be rubbing directly against something else." In response to whether the abrasion was "consistent with a patient who presents with a strangulation," the nurse responded, "It could be consistent with the history the patient gave."

The nurse further acknowledged that a subconjunctival hemorrhage is a burst capillary or blood vessel in the eye. She explained a subconjunctival hemorrhage is the result of a change in blood pressure: "[s]uch as it can be caused by coughing, it can be caused by vomiting, [and] it can be caused by pressure that's in a strangulation. It can be caused by different things." She determined KM's injury was "consistent" with strangulation.

On cross-examination, trial defense counsel developed testimony that KM did not report other symptoms typically associated with strangulation such as bleeding, loss of bowels or bladder control, coughing, or nausea. The Defense also elicited testimony that established the nurse did not observe or document petechiae at the time of the exam. The nurse acknowledged KM's injuries could have been caused by something other than strangulation.

#### b. Appellant's Testimony

As noted above, Appellant testified in the defense case. He denied committing each of the offenses in which AJ and KM were named victims, asserting

he had not engaged in conduct charged by the Government. Likewise, he disclaimed any conduct on his part could have caused injury to AJ or KM. Appellant explained in general terms that he once saw AJ come home with injuries. He also acknowledged AJ previously had expressed a desire that he put his hands around her neck when they were sexually intimate. Turning to the incident with KM, Appellant described how KM had become "enraged" and was throwing things at him after he said that he was breaking up with her. He explained she previously had engaged in similar aggressive behavior. He was concerned she would harm him, his son, or herself when she stormed off to the back of the house where he kept a firearm.[31] For this reason, Appellant "bear hugged" KM and tried "telling her to calm down and chill out." With his arms wrapped around her, KM "began to struggle, and in the midst of the struggle [they] tripped over" an object on the floor and fell down. "[E]ven with the fall . . . [Appellant] was able to maintain contact with [KM]." They eventually separated and spent the rest of the evening in different rooms. Appellant specifically denied grabbing KM by the neck or covering her mouth and nose with this hands.

On cross-examination, Appellant again denied he caused any injury to AJ or KM. Without trial defense counsel objection, Appellant maintained those denials when trial counsel confronted him with pictures, conclusions drawn from expert testimony, and other evidence of specific injuries. Trial counsel asked Appellant about his earlier testimony where he claimed that AJ wanted him to strangle her during sex. Trial counsel asked, "Do you believe that's maybe a source of the injuries in those photos?" Appellant responded, "According to what an examiner[32] would say, yeah, they line up." Later, he asked and then answered his own question, "[D]o I think that me doing those actions during sexual interactions [with AJ] caused those [injuries]? It's a possibility." Regarding the incident with KM, trial counsel confronted Appellant with his prior statement to investigators. In that statement, Appellant described the same

---

[31] Appellant testified KM became upset when he said he planned to attend a softball game without her. The conflict escalated when KM "snatched [his] phone out of [his] hand and threw it to the end of the couch" and "slammed" his laptop shut. KM also threw his "slides" and his "son's spiked ball." On other occasions, KM had made comments "that gave [Appellant] concerns that she was violent," to include harming an ex-boyfriend with a gun, knife, or car. The members were instructed on, and rejected, the theory of self-defense.

[32] Appellant was present during the testimony of the forensic nurse who, as described earlier, was recognized by the court as an expert in forensic nursing. Trial counsel asked the expert, "I may use the term forensic nurse *examiner*. Is that synonymous with a forensic nurse?" (Emphasis added). The expert responded, "That is fine."

bear hug as a "warm embrace."[33] Appellant denied any action other than a "bear hug . . . to restrain her," and his purpose was "[t]o prevent her from striking [him]."

The question and answer exchange that followed included trial counsel's line of inquiry about the cause of KM's injuries, which Appellant challenges on appeal. During this exchange, trial counsel sought to have Appellant explain how KM's injuries could have occurred based on his sworn testimony and his description of events:

> Q [Trial Counsel]. Okay. *At what point in that interaction, do you think she got the subconjunctival hemorrhage?*
>
> A [Appellant]. I don't recall ever seeing that, sir.
>
> Q. I know, but you now know that it exists?
>
> A. Yes, sir.
>
> Q. At what point do you think she got it?
>
> A. Not during that point that I -- well, *from listening from the experts*, it doesn't sound like any of that could -- any of these kind of things could've caused that, so ----
>
> Q. Okay. So you admit, then, that your testimony *isn't really consistent* with her injuries?
>
> A. No. It's not consistent with her injuries.
>
> Q. Okay. All right. *So what do you think caused those petechiae on her throat?*
>
> A. They can come from choking herself, strangulation, *as the expert said.*
>
> . . . .
>
> Q. *As you described this situation, what part of that do you think could've caused those petechiae?*
>
> A. None at all.
>
> Q. *Okay. But you agree and you now know that she did have them, right?*
>
> A. That's correct.

---

[33] Appellant testified he agreed to these words, which were suggested by the investigator.

Q. So your testimony and the way you've described the altercation, *is not consistent with her injuries?*

A. That's correct.

(Emphasis added).

In response to Appellant's assertion that he and KM both tripped, fell down together, and were then laying "face-to-face" on their sides, trial counsel asked "what part of that would've caused *that pattern injury* underneath her bra strap?" (Emphasis added). Appellant answered "[i]n regards to what the expert said, she said something in regards to her weight being on the ground . . . and having an item pressed against her skin." When asked what part of the incident, as described by him, could have caused that injury, Appellant answered "I don't think it could've caused it at all." The trial counsel then questioned Appellant about the "neck pain [KM] experienced afterwards, the difficulty swallowing, the pain in her neck to move it, her headache, her difficulty talking." Trial counsel asked Appellant, "[W]hat about that altercation, as you've described it, could've caused those injuries, as you understand it?" Appellant answered, "Not -- well my actions during that whole entire altercation could not have caused any of those things."

Trial counsel again drew Appellant's attention to his testimony about the incident with KM. Trial counsel asked, "[Y]ou acknowledge that the way you described [the incident] is in no way consistent with the corroborating evidence of medical injuries?" At this point, the Defense objected on the basis that Appellant "is not the qualified expert who can opine on consistencies [of injuries] or anything like that." The military judge sustained the objection and told trial counsel to "move on."

### c. Trial Defense Counsel Responses to "Mechanism of Injury"

Because Appellant claims trial defense counsel provided deficient representation, the court ordered and received declarations from both trial defense counsel to explain why the Defense did not object to the questioning of Appellant regarding the "mechanism of injury." We considered those declarations and are again convinced a hearing is unnecessary to resolve any factual disputes. *See Ginn*, 47 M.J. at 248; *DuBay*, 37 C.M.R. at 413.

The lead counsel gave four reasons why the Defense did not object to trial counsel's questioning of Appellant. First, "we knew that [Appellant]'s testimony was going to conflict with the evidence that was already before the

panel."[34] Second, Appellant's "testimony was consistent with the Defense's theme and theory—that [Appellant] did not cause the injuries, and that there is reasonable doubt as to what caused them." Third, the Defense "hoped that [Appellant]'s candid responses throughout his testimony would boost his credibility." "Fourth, it was clear that [Appellant] was not an expert. He was just a Staff Sergeant who had seen the evidence admitted at trial and was trying his best to answer a [trial counsel]'s questions."[35]

The co-counsel declared, "At first, it did not come across as Appellant being asked to give a medical diagnosis." He elaborated that "Appellant had observed the evidence at trial, including the [G]overnment's expert testimony, and was competent to offer lay opinions about how his testimony was consistent (or not) with the [G]overnment's evidence." He continued: "However, when the [ ] trial counsel later morphed this idea to become a medical credibility contest between Appellant and the [G]overnment experts (by infusing the word 'medical' and appearing to try to elicit an improper medical conclusion from Appellant), [the Defense] successfully objected."

### d. Analysis

Appellant claims trial counsel should not have been permitted to cross-examine him in the manner that he did. Appellant makes the point in his brief that once the Defense finally did object on the basis that Appellant was not a "qualified expert who can opine on consistencies [of injuries] or anything like that," the military judge properly sustained the objection. Appellant contends it was plain error and an abuse of discretion for the military judge not to stop this line of questioning, *sua sponte*, at its inception, and the Defense was constitutionally deficient in failing to object sooner than it did. Support in Appellant's brief relies on a military judge's "independent gatekeeper responsibilities" before allowing expert testimony. He cites to Mil. R. Evid. 701, 702, and 703[36] for his stance that he "was simply unqualified to render any opinion as to the mechanism of injury or whether his version of events was consistent with medical evidence and/or testimony."

---

[34] The lead trial defense counsel elaborated, "[T]he Government had already put forth significant evidence" that Appellant's actions were causal: "both victims had testified that [Appellant] had strangled them; both victims were intimate partners of [Appellant]; both victims had photographs of their injuries; and a medical expert had testified that the victims' testimony and injuries were consistent."

[35] The lead trial defense counsel specified, "[T]he way I viewed [Appellant]'s testimony as it came out during trial was an attempt to describe what he believed the Government's expert had testified to rather than offer expert opinions of his own."

[36] *See* Mil. R. Evid. 701, *Opinion testimony by lay witnesses*; 702, *Testimony by expert witnesses*; 703, *Bases of an expert's opinion testimony*.

The Government counters Appellant's contentions, answering that "Appellant had sufficient personal knowledge about KM's injuries—and the [G]overnment's evidence—to offer lay opinions about how the injuries were consistent (or not) with [Appellant's] testimony" that he did not cause them. *See* Mil. R. Evid. 701(a) (stating lay opinion "rationally based on the witness' perception" is allowed). In this regard, the Government explains that a lay witness like Appellant, who had firsthand knowledge of the incident in question, need not resort to "scientific, technical, or other specialized knowledge," Mil. R. Evid. 701(c) and 702(b), to explain the source of KM's injuries once he took the stance that he bore no responsibility for causing them.

The Government distinguished Appellant's trial with "a case in which a lay witness [is] asked to opine about the cause of injuries that resulted from a back-and-forth fight" where "forensic judgement[ ] exists within the realm of expert opinion." Here, in contrast to such a case, the Government explains Appellant's testimony that he challenges on appeal was "rationally based on [his] perception," Mil. R. Evid. 701(a); "helpful to clearly understanding" his testimony; and helpful "to determining a fact in issue," Mil. R. Evid. 701(b), namely, to test Appellant's assertions that he did not cause KM's injuries. (Alteration in original). Citing *United States v. Roberson*, the Government argues that trial counsel's challenge of Appellant's testimony was permissible under a plain error standard of review because "[n]o unique ability or specialized training is required to form such opinions." 65 M.J. 43, 47 (C.A.A.F. 2007) (concluding a lay witness may testify about another's emotional state so long as the opinion "is based upon personal observation and is relevant").

At the outset, we find it necessary to diverge from Appellant's characterization that he was cross-examined on whether the "mechanism of injury was consistent with that of the qualified expert opinion testimony the [G]overnment elicited during its case in chief." In our review of the record, the nurse who was recognized as an expert in forensic nursing did not offer an opinion that Appellant—as a mechanism—caused the injuries she examined, documented, treated, and testified about on direct examination. Rather, the nurse testified KM's injuries were consistent with particular types of *conduct*; for example, she opined that KM's injuries were consistent with "a patient who presents with a strangulation." The nurse described the injuries in medically descriptive terms and gave possible causes. Her opinion was more limited than "mechanism of injury" would suggest, and did not in itself implicate Appellant as the cause of KM's injuries.

Second, and in the main, trial counsel did not elicit from Appellant that he held an opinion inconsistent with the nurse's *expert opinion*. Rather, trial counsel twice asked Appellant to admit, without objection, that his testimony "isn't really consistent" (the first time trial counsel asked the question) and was "not

consistent" (the second time trial counsel asked the question) "*with [KM's] in-juries.*" (Emphasis added). The premise that Appellant was asked to give an unqualified expert opinion on whether his testimony was contrary to the opinion of the Government's expert witness, is not this case. In context, this was far and away not a battle of the experts, and Appellant was not put in the position of fighting against the Government as an unqualified proxy for a defense expert witness.

For this reason, we likewise reject the premise of Appellant's assertion on appeal that "[u]nlike the duly qualified experts who testified during the Government's case in chief, Appellant did not possess the requisite qualifications or training to offer medically-based opinion testimony." In this regard, we agree with the Government that trial counsel's unobjected-to questions did not elicit such an opinion from Appellant, much less one only an expert was qualified to give.[37] The nurse gave a medical description and an explanation of KM's injuries that was founded in anatomy and, to an extent, physiology, but evidence of those injuries was already before the factfinder through KM's testimony and photographs. It was not clear or obvious error for trial counsel to avoid lay jargon by repeating descriptive terms such as "subconjunctival hemorrhage" and "petechiae on her throat," in questions he put to Appellant, and doing so did not render Appellant's answers the equivalent of a "medically-based opinion" or an expert opinion as claimed.

The court finds the challenged line of questioning was neither irrelevant, Mil. R. Evid. 401 and 402, nor unduly prejudicial or confusing, Mil. R. Evid. 403. We further find Appellant understood the questions posed to him. For these reasons, the court again finds no clear or obvious error under a plain error standard of review such that the military judge abused his discretion in failing to *sua sponte* stop trial counsel's line of inquiry. *See Lopez*, 76 M.J. at 154. We also find that Appellant has not rebutted the strong presumption that trial defense counsel was not constitutionally deficient under the Sixth Amendment for failing to object as Appellant contends on appeal. *See Strickland*, 466 U.S. at 689; *Scott*, 24 M.J. at 188; *see also Schmidt*, 82 M.J. at 74 n.2 (Sparks,

---

[37] Although not raised as a separate assignment of error, Appellant claims on appeal that the military judge erred by allowing trial counsel to argue that Appellant's testimony was not credible by including the following statement attributed to Appellant in a slide trial counsel used in closing argument: "My version could not have caused the hemorrhage, petechiae, pattern bruises on back . . . my version is inconsistent with medical signs[.]" At trial, the Defense objected to this slide on the basis that Appellant was "not an expert in nursing" and thus "incapable of opining on any kind of medical diagnoses." We find no merit to this issue because trial counsel did not seek an expert opinion from Appellant or elicit testimony that Appellant was not qualified to give.

J., announcing the judgment of the Court) ("Appellant's failure to show plain error is fatal to his ineffective assistance of counsel claims.").

Finally, to the extent Appellant's assignment of error asserts that a party cannot challenge a witness by probing whether that witness' testimony may be inconsistent with descriptions of injuries from other testimony, evidence, or sources, we hold that such questions are not error, plain or otherwise, when the relevance and foundation for such probing has already been established. Such questioning is often fundamental to principles of confrontation and the truth-seeking function of trial itself, as they were here.

## C. Trial Counsel's Sentencing Argument

Appellant contends that trial counsel's sentencing argument was improper and asks the court to set aside the sentence. Appellant claims trial counsel improperly (1) argued Appellant failed to apologize to the victims; (2) appealed to what the "audience" would think; and (3) asked the members to consider "trauma" Appellant inflicted on his non-victim son. The Defense did not object at any point during argument. We address each contention in turn and conclude that trial counsel's argument was not plainly improper.

During sentencing argument, "[t]rial counsel may . . . refer to the sentencing considerations set forth in R.C.M. 1002(f)." R.C.M. 1001(h). These considerations include "the nature and circumstances of the offense and the history and characteristics of the accused." R.C.M. 1002(f)(1). They also include the "impact of the offense on . . ." the "social, psychological, or medical well-being of any victim of the offense," R.C.M. 1002(f)(2)(A), and on "the mission, discipline, or efficiency of the command of the accused and any victim of the offense." R.C.M. 1002(f)(2)(B). In addition to these considerations, trial counsel may refer to the need for the sentence to: "(A) reflect the seriousness of the offense; (B) promote respect for the law; (C) provide just punishment for the offense; (D) promote adequate deterrence of misconduct; (E) protect others from further crimes by the accused; [and,] (F) rehabilitate the accused . . . ." R.C.M. 1001(h); R.C.M. 1002(f)(3).

Claims of prosecutorial misconduct and improper argument are reviewed de novo. *United States v. Marsh*, 70 M.J. 101, 104 (C.A.A.F. 2011). Appellant has forfeited the right to challenge trial counsel's sentencing argument on appeal because there was not an objection at trial and, as such, we review the propriety of trial counsel's remarks for plain error. R.C.M. 1001(h); *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019), *cert. denied, Voorhees v. United States,* 140 U.S. 2566 (2020). Plain error occurs when "(1) there was an error, (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right." *United States v. Erickson*, 65 M.J. 221, 223 (C.A.A.F. 2007) (citations omitted). "As all three prongs must be satisfied in order to find plain error, the

failure to establish any one of the prongs is fatal to a plain error claim." *Bungert*, 62 M.J. at 348.

"When arguing for what is perceived to be an appropriate sentence, the trial counsel is at liberty to strike hard, but not foul, blows." *United States v Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000) (citations omitted). Additionally, "it is improper for counsel to seek unduly to inflame the passions or prejudices of the court members." *United States v. Clifton*, 15 M.J. 26, 30 (C.M.A. 1983) (citations omitted). However, "the argument by a trial counsel must be viewed within the context of the entire court-martial." *Baer*, 53 M.J. at 238. "The focus of our inquiry should not be on words in isolation, but on the argument as viewed in context." *Id.* (internal quotation marks omitted).

Not every improper comment by the prosecution rises to a constitutional violation. *United States v. Webb*, 38 M.J. 62, 65 (C.M.A. 1993). Instead, we evaluate the comment in the context of the overall record and the facts of the case. *Id.* In determining prejudice, we consider whether "'trial counsel's comments, taken as a whole, were so damaging that we cannot be confident' that [the appellant] was sentenced 'on the basis of the evidence alone.'" *Erickson*, 65 M.J. at 224 (quoting *United States v. Fletcher*, 62 M.J. 175, 184 (C.A.A.F. 2005)). Where the weight of the evidence amply supports the sentence imposed, we can be confident an appellant was sentenced on the basis of the evidence alone. *United States v. Halpin*, 71 M.J. 477, 480 (C.A.A.F. 2013).

### 1. Trial Counsel's Comment on Failure to "Offer an Apology"

Appellant contends that trial counsel improperly argued for a sentence based on Appellant's failure to apologize to AJ and KM, the victims named in the seven assault consummated by a battery specifications.

#### *a. Background*

As noted above, Appellant testified in his own defense, which opened with trial defense counsel eliciting blanket denials from Appellant as to every allegation involving AJ and KM. Appellant answered pointed questions about whether he did a particular act with, "No, sir. I did not." By the end of his direct examination, Appellant denied committing each assault consummated by a battery, repeating, "No, sir. I did not," every time trial defense counsel asked about a particular charged act.[38]

---

[38] At the same time Appellant denied the charged acts against KM, Appellant testified he chased KM when she headed to the back of the house where he kept a firearm. Out of concern she would access a weapon in the home and use it to harm herself or his son, he "grabbed her by her right shoulder and spun her around." At one point, "It looked like she was going for a swing, but [Appellant] kind of grabbed her by her hoodie and pulled her in and bear hugged her" in defense.

### *i) Victim Unsworn Statements*

Before Appellant presented his sentencing case, AJ and KM both delivered unsworn statements, each directing the better part of her comments at Appellant. AJ began her unsworn statement by telling Appellant, "These actions are yours. You have caused so much hurt." She expressed hope that Appellant could comprehend what he had done and one day "accept responsibility." She expressed concern that "without punishment, without consequences," Appellant "will continue to believe that [he] can get away with this and that it is okay to abuse others." AJ then spoke to the members, explaining she was "forever changed because of [Appellant's] abuse. The damage that [Appellant] caused [her] still lingers." She explained the "psychological scars remain" and how she "struggled with crushing depression" and "suffered panic attacks." At times, she "couldn't eat, [she] couldn't sleep, and for a while, [she] couldn't feel. [She] was numb to everything. [She] was not the [noncommissioned officer] or Airman [she] could have been." She concluded by telling the members,

> I realize how fortunate I am to have escaped with my life. In deciding on the appropriate sentence, I ask you to consider the seriousness of his offenses and the impact I have described. In this moment, at this time, I stand before you and ask you to do what I cannot; hold him accountable. Thank you.

KM told Appellant how "everything changed after [he] strangled [her]." She detailed for the members how Appellant's crimes affected her relationships, and led her to drink "so much to ease the pain, to feel happy even for just a minute." KM told Appellant she forgave him, and "refuse[d] to be angry with [him] any longer." She asserted Appellant "take[s] everything as a joke," and told him, "I hope you finally see the severity of your actions. I hope today changes you." She concluded by telling Appellant,

> There was nothing that I did to deserve this, and I have to remind myself every day that I'm valuable, and I will get through this. As for you, while I do believe in forgiveness, I hope you are punished. You have impacted my life on a fundamental level, and I hope the sentence crafted for you does the same.

### *ii) Appellant's Unsworn Statements*

Appellant made the relationship with his son the focal point of his sentencing case. This conclusion is supported by Appellant's brief wherein he allows that "a significant focus of Appellant's sentencing case was the strong, caring relationship he shared with his son." Appellant exercised his right to make an

unsworn statement and did so not only verbally, but also in a signed written statement.[39]

In his written unsworn statement, Appellant did not reference his misconduct regarding AJ or KM. He "apologize[d] to the Court, [his] unit, and the Air Force for even being at this court-martial." He "regret[ed] the actions that led to this point, [he] ha[d] learned from them, and they will never be repeated." Appellant explained that he felt like he "failed [his] son and [him]self," owing to the time he spent in pretrial confinement. He told the members he had "missed a substantial amount of time with [his] son and would like to return to his [son's] life and watch him grow." He concluded that statement noting he had "been deprived [of] the most important thing in the world to [him]—[his] son." He "ask[ed] that [the members] please consider hi[s son] in determining [his] sentence as well." He explained, "My son needs me, and I need him. Please temper your sentence with a sense of mercy in my case. Thank you."

Appellant made no mention of his behavior, much less matters in extenuation, in responses he gave to trial defense counsel questions during his oral unsworn statement. Appellant talked about life with his parents and brother, and traveling with his father. He explained how he made the decision to enlist in the Air Force, and talked about garnering recognition as the top junior enlisted Airman at the USAFA 10th Air Base Wing for the first quarter of 2018. Appellant talked about family pictures with his parents and his son, and pictures of Appellant at a community service project that he participated in during Airman Leadership School. Trial defense counsel commented, "So we've heard a lot about your son," and asked Appellant what it was like when his son was born. Appellant explained he was a young Airman and used most of his accrued leave to be with AJ during delivery.[40] Appellant explained he was devastated by not being able to spend time with his son for the 10–11 months he spent in pretrial confinement. Appellant concluded by thanking the members "for playing a part of [his] court-martial" and asked them to "take into consideration a father who just wants to be a part of his son's life."

---

[39] Without objection, Appellant's written statement was marked as a defense exhibit and published to the members to review at the end of the defense presentencing case and during the members' deliberation on sentence.

[40] Appellant and AJ were assigned to different installations when their son was born.

### *iii) Trial Counsel's Argument*

Trial counsel began sentencing argument by identifying the convictions for assault consummated by a battery, and asserting Appellant lied to the members when he testified in findings.[41] She suggested Appellant failed to express remorse or apologize to his victims when he presented his unsworn statements. Trial counsel then summarized the facts from the Government's view of the evidence:

> Assault, strangulation, taking the stand and under oath, trivializing. Who does that? Who treats another human being like that, let alone someone you're supposed to love, someone that loves you? That tells you all you need to know about the accused; that he's an abuser, that he doesn't care about anybody, but himself. And clearly, he thinks so little of his crimes that instead of, in his own words, being the man, taking ownership of that fact, he chooses to lie to you about it.
>
> You just heard from his parents, from the accused himself. He gets up here -- don't feel guilty about an appropriate sentence. That's still the same person who viciously assaulted and strangled [AJ] and [KM]. Those were his crimes, those were his choices, he put himself here. That's who he is; not when he's standing in court in front of the people who are about to decide his fate.
>
> *Additionally*, that was a perfect opportunity for him to express remorse and offer an apology to [KM] and [AJ]. No remorse, no emotion. *That's why* you should sentence the accused to forfeit all his pay and allowances, to be reduced to the rank of E-1, to be confined for eight years, and to be dishonorably discharged from the United States Air Force.

(Emphasis added). Next, trial counsel asked a rhetorical question, which she answered at once and throughout the remainder of her argument:

> *Now, how do you get to that sentence?* How do we know that that is an appropriate sentence so the accused will be acutely aware of the consequences of his actions, a sentence that will both deter the accused, and anyone here who hears about his crimes, from

---

[41] The military judge instructed the members they may consider the question of whether Appellant testified falsely in the findings portion of the court-martial as it may bear on the likelihood that Appellant can be rehabilitated. *See United States v. Jenkins*, 54 M.J. 12, 19 (C.A.A.F. 2000); *United States v. Warren*, 13 M.J. 278, 279 (C.M.A. 1982). We find the instruction was not an abuse of discretion.

> even thinking about doing this to someone else, and find some small amount of justice for [AJ] and [KM]?

> You do that by considering the facts, what happened, that you have heard from the witness stand this past week, from really understanding the lasting impacts for [AJ] and [KM], and by ensuring the sentence is severe enough to serve as an effective deterrent.

(Emphasis added). In the seven and a half pages of the record that capture the rest of trial counsel's argument, she explained the facts of the case that touched on various principles of sentencing to justify the Government's recommended sentence.

### b. Analysis

Before addressing this claim for relief, the court addresses a related point that we determine is founded on a reading of trial counsel's argument that is different from our own. Appellant asserts that the sole justification for trial counsel's sentence recommendation was Appellant's failure to apologize. Appellant explains trial counsel argued that Appellant's unsworn statements were "a perfect opportunity for him to express remorse and offer an apology to [KM] and [AJ]. No remorse, no emotion," and then she proceeded to explain "*[t]hat's why*" her recommended sentence was appropriate. (Emphasis added). In Appellant's telling, trial counsel "explicitly argued that the very reason [members] should adjudge her recommended punishment is precisely *because* Appellant did not apologize." Appellant continues, "Given that Appellant pled not guilty to all charges, the way in which she phrased this argument infringed upon his constitutional and statutory rights against self-incrimination."

As a threshold matter, the court departs from this understanding of the record. In our reading of the remarks that precede and follow the words, "[t]hat's why," the court is not convinced that the sole justification for trial counsel's sentence recommendation was Appellant's failure to apologize. *Baer*, 53 M.J. at 238 (observing "it is improper to 'surgically carve' out a portion of the argument with no regard to its context"). Appellant reads the subordinating conjunction "[t]hat's why" to connect only the substance of one statement before the conjunction with the recommendation that followed. But this reading ignores the first word of the statement preceding the conjunction, which reads in its entirety, "*Additionally*, that was a perfect opportunity for him to express remorse and offer an apology to [KM] and [AJ]. No remorse, no emotion." (Emphasis added).

"Additionally" is a conjunctive adverb that connects the totality of trial counsel's opening argument with her sentence recommendation. In those opening remarks, trial counsel argued that Appellant mistreated his victims and

then lied when he testified. Trial counsel then summarized evidence in the case that showed Appellant "viciously assaulted and strangled" his spouse and an intimate partner, and reminded the members that Appellant was more than the Airman who was "standing in court in front of the people who are about to decide his fate." She supported her sentence recommendation throughout the rest of her argument. She did so with a transition that immediately follows her sentence recommendation: "Now, how do you get to that sentence?" Consequently, reading the words "[t]hat's why" in context leads to a very different understanding than the one asserted by Appellant. Thus, the court does not need to decide whether a sentence recommendation wholly predicated on an Appellant's failure to apologize is improper under a plain error standard of review. In our view, this is not that case.

We then consider whether the contention that trial counsel's single reference to Appellant's lack of apology was improper in the context of the entire trial and sentencing. Here, Appellant twice waived his constitutional right to remain silent. He gave sworn testimony in findings that he did not commit the acts charged. As was his right, he twice delivered unsworn statements during sentencing that lacked any meaningful acknowledgment of the victims or matters in extenuation regarding his convictions. However, the manner by which one chooses to exercise a right may have consequences that are revealed to be adverse, even if unintended at the time that right is exercised.

The court finds it was not plain error for trial counsel to argue for a sentence which considered that Appellant failed to express remorse or offer an apology to AJ or KM. The court is not persuaded Appellant was sentenced for a constitutionally protected decision. We reach this conclusion because trial counsel did not expressly comment on Appellant's right to trial or right to remain silent. *Cf. United States v. Stephens*, 67 M.J. 233, 235–36 (C.A.A.F. 2009) (distinguishing cases in which the trial counsel "explicitly commented on the fact that the appellant's invocation of his constitutional right to trial forced the victim to endure the rigors of cross-examination and relive the experience of being attacked").

We can analogize to the general principle that once an accused waives his right to remain silent, "[h]e cannot reasonably claim that the Fifth Amendment gives him . . . immunity from cross-examination on the matters he has himself put in dispute." *United States v. Brown*, 356 U.S. 148, 155–56 (1958). Appellant had "no right to set forth to the [members] all the facts which tend in his favor without laying himself open to a cross-examination upon those facts." *Id.* at 155 (quoting *Fitzpatrick v. United States*, 178 U.S. 304, 315 (1900)). The court finds this principle reaches a trial counsel's sentencing argument. Relevant too, in *United States v. Paxton*, the United States Court of Appeals for the Armed Forces (CAAF) held that during sentencing argument a trial counsel

may not comment upon an accused's exercise of his or her constitutionally protected rights to not testify or to plead not guilty. 64 M.J. 484, 486 (C.A.A.F. 2007). The CAAF re-affirmed that "an accused's refusal to admit guilt after findings may be an appropriate factor for the member[s'] consideration in their sentencing deliberation on rehabilitation potential but only if a proper foundation has been laid." *Id*. at 487 (citing *United States v. Edwards*, 35 M.J. 351, 355 (C.M.A. 1992)). The CAAF explained that a proper foundation exists when "an accused has either testified or has made an unsworn statement and has either expressed no remorse or his expression of remorse can be arguably construed as being shallow, artificial, or contrived." *Edwards*, 35 M.J. at 355.

Here, Appellant established the requisite foundation when he testified in findings, and then exercised the right of allocution in the sentencing portion of his court-martial. Applying *Paxton* and *Edwards*, the absence of any remorse shown by Appellant was a legitimate comment on Appellant's rehabilitative potential. *See* R.C.M. 1001(h); R.C.M. 1002(f)(3)(F); *see also United States v. Garren*, 53 M.J. 142, 144 (C.A.A.F. 2000) (concluding "trial counsel's sentencing argument that appellant did not accept responsibility was wholly fair and accurate under the circumstances of this case and did not constitute improper comment on appellant's right to plead not guilty"). The court finds no merit to the contention that the language trial counsel used in argument infringed upon Appellant's constitutional or statutory rights against self-incrimination. Thus, Appellant has not demonstrated it was improper for trial counsel to argue that Appellant expressed no remorse or that he failed to apologize to AJ or KM.

### 2. Claim that Trial Counsel Improperly Appealed to What Others Would Think

Appellant contends that trial counsel improperly "argued for a sentence based not upon what the evidence demonstrated, but based upon what others in the 'unit,' the 'courtroom,' and the 'audience' would think." To resolve this assignment of error, the court examines two facets: (1) whether trial counsel did not argue the evidence in the case; and (2) whether trial counsel argued for a sentence predicated on what others would think.

#### a. Background

As noted above, trial counsel began her argument with an assertion that Appellant lied when he testified in findings. She also asserted Appellant failed to express remorse or apologize to his victims when he delivered his unsworn statements. Both comments have support in the record. Trial counsel suggested a recommended sentence and asked, "Now, how do you get to that sentence?" Before answering her own question, trial counsel remarked that "an appropriate sentence" is one that would cause the accused to "be acutely aware of the consequences of his actions, a sentence that will both deter the accused,

and anyone here who hears about his crimes, from even thinking about doing this to someone else, and find some small amount of justice for [AJ] and [KM]." Trial counsel's next statement answered her rhetorical question, "You do that by considering the facts . . . that you have heard from the witness stand this past week, from really understanding the lasting impacts for [AJ] and [KM], and by ensuring the sentence is severe enough to serve as an effective deterrent."

Trial counsel again focused on evidence in the case when she discussed her confinement recommendation. She asked the members not to forget "the excruciating details of what the accused has done to these two ladies." She reminded them that "we're talking about the accused putting his hands around [AJ's and KM's] throats, looking at them in the eye, to the point they can't breathe, they feel pressure building up in their face and in their eyes, and the accused [is] watching the life drain out of them." She told the members to "[j]ust think about the shamelessness it must have taken for him to attack his wife, [AJ]." She reminded the members that Appellant had "strangl[ed KM], scaring her to the point where she won't even talk to him about it. And in April, [he] straddl[ed] her and, again, putting her through it all over again, strangling her nearly to death."[42] Trial counsel then argued an inference from this evidence, which she asserted showed "patterns" of "escalating behavior." In her telling, "Clearly the accused has a need to control women. He calls the shots, he's a man, he's going to run his house the way 'he' wants to, and nobody's going to tell him no, or they're gonna pay a price. That's who he is."

Trial counsel commented on evidence of Appellant's convictions for failing to register his personal firearms, various letters of reprimand, and performance reports that she argued showed a failure to meet standards. She explained, "You can't trust him to obey orders, you can't trust him to treat his family with dignity and respect, and you can't trust him to learn anything from this court-martial with any less than eight years confinement."

---

[42] Later in argument, trial counsel invited the members to "[t]hink back to [KM's] testimony." Referencing that testimony, trial counsel argued,

> She explained to you how she was begging the accused to just talk to her, because she was just trying to understand what she did to deserve this, as she's wheezing, tapping against the window hoping anybody will hear her, wondering how her family won't understand what happened to her. Being viciously assaulted by someone you love just because you want them to hear you, to listen to you, to validate you, this should not be a part of the human experience. Think about what that would do to someone.

Trial counsel addressed general and special deterrence as part of her argument. She asserted, "[A]lmost inherent in the phrase, 'appropriate punishment,' is that [the member's] sentence must send the right message to the accused and to all the Air Force, that committing crimes of this magnitude will come with severe punishment." She continued, arguing "an effective deterrent" requires the members to tailor "the amount of confinement . . . not only to the facts of this case and the impact on the victims, it must be tailored to the accused himself." She gave the example,

> If the accused walks out of prison thinking, "Well, that wasn't so bad," then it's just not enough. If the accused finishes his confinement thinking anything other than, "I will never do that again," then it's just not enough. It has to hurt. It has to teach him a lesson he'll never forget, and it has to be long enough for him to understand that.

After explaining why eight years of confinement was required for Appellant to "understand" his crimes and "teach him a lesson he'll never forget," trial counsel argued that the principle of deterrence

> applies to the rest of the Air Force as well. *Nobody in his unit, nobody here today in the courtroom can walk away thinking the punishment didn't quite measure up.* The amount of confinement [the members] give the accused has to be striking. If [the members] were surprised to hear the [G]overnment's recommendation was eight years, good, that's the feeling of deterrence. The accused should feel that same feeling when he comes back in here and after [the members'] deliberations, [when the members] announce a severe and lengthy sentence. If you boil down deterrence to the most basic level, it does come down to fear; fear that if he was ever to stoop so low again, to debase himself to the point that he would put hands on a woman, that he would be severely punished and legitimately face substantial time.

(Emphasis added).

At the conclusion of argument, trial counsel again referred to Appellant's testimony, arguing he "trivialized" the "emotional tug-of-war, the brutalization, [and] the dehumanization [AJ and KM] experienced" at his hands. She argued Appellant also "trivialized" what he had done "by looking at [the members] and telling [the members] that [AJ and KM] were just making it up." Trial counsel ended the argument by asking the members to

> [t]hink of other Airmen that might come upon similar situations. Make sure you send a message to both the accused and to anyone who learns about this case, that there are no circumstances, no

reason whatsoever, that domestic violence is ever okay. *The audience here today has to know that [the members] acted decisively and have sent a clear message through an appropriate sentence.*

(Emphasis added).

### *b. Analysis*

We begin with Appellant's contention that trial counsel's deterrence argument was not predicated on evidence. In our review of the record, this assertion is not supported, and we are not convinced that trial counsel's sentencing argument was improper for arguing facts not in evidence as claimed.

Next, the court considers Appellant's allegation that trial counsel improperly argued for a sentence predicated on what others would think. For support, Appellant relies on *United States v. Norwood*, 81 M.J. 12 (C.A.A.F. 2021). In that case, the trial counsel asked the members, without objection, to think about what would happen "when you all return to your normal duties . . . . [A]nd someone asks you . . . . 'Wow, what did [Appellant] get for that?' Do you really want your answer to be 'nothing at all'?" *Id.* at 19 (alterations in original). Under a plain error standard of review, the CAAF set aside the sentence, finding the trial counsel had "pressured the members to consider how their fellow service-members would judge them and the sentence they adjudged instead of the evidence at hand." *Id.* at 21. The CAAF reasoned, "Arguing an inflammatory hypothetical scenario with no basis in evidence amounts to improper argument that we have repeatedly, and quite recently, condemned." *Id.* (citing *Voorhees*, 79 M.J. at 14–15). The CAAF reminded practitioners that "[t]rial counsel may properly ask for a severe sentence, but [they] cannot threaten the court members with the specter of contempt or ostracism if they reject [their] request." *Id.* (alterations in original) (quoting *United States v. Wood*, 40 C.M.R. 3, 9 (C.M.A. 1969)).

To a degree, Appellant fittingly analogizes *Norwood*, explaining, "As in *Norwood*, trial counsel argued for a sentence . . . based upon what others in the 'unit,' the 'courtroom,' and the 'audience' would think." However, in our view, the analogy only goes so far. Unlike *Norwood*, the remarks here cannot be understood to pressure or threaten the members with contempt or ostracism from others if they reached a sentence that was less than trial counsel's recommended eight years' confinement. At no point did trial counsel suggest that others would judge them unfavorably if they imposed, or did not impose, a certain sentence. Trial counsel frequently referenced evidence in the case, explaining the aggravating circumstances of Appellant's convictions to justify her sentence recommendation.

We decline to extend *Norwood* to remarks aimed at specific or general deterrence that are founded in the record and devoid of pressure or threats. In

argument, trial counsel is permitted to refer to the need for the sentence to: "(A) reflect the seriousness of the offense; (B) promote respect for the law; (C) provide just punishment for the offense; (D) promote adequate deterrence of misconduct; (E) protect others from further crimes by the accused; [and] (F) rehabilitate the accused . . . ." R.C.M. 1001(h); R.C.M. 1002(f)(3). It is clear that trial counsel's remarks were an appropriate comment on these six considerations, and did not "invite the court members to rely on deterrence to the exclusion of other factors." *United States v. Lania*, 9 M.J. 100, 104 (C.M.A. 1980); *see also United States v. Thompson*, 9 M.J. 166, 166 (C.M.A. 1980) (inviting members to "[c]onsider deterrence of other individuals under the like circumstances" when fashioning a sentence was not improper). Appellant has not demonstrated trial counsel's argument, in context, was clear or obvious error under a plain error standard of review. *See Erickson*, 65 M.J. at 223.

### 3. Claim that Trial Counsel Improperly Argued Trauma Inflicted on Appellant's Son

Appellant contends that trial counsel improperly argued for the members to consider "trauma" he inflicted on his non-victim son.

#### a. Background

Trial counsel argued for a sentence that would take into consideration "the impacts and the effects the accused's crimes have had, and will continue to have, on [AJ] and [KM]." She then argued for the members to "[t]hink again about [AJ] and [her son]. In addition to *all the trauma they experienced in the moment of those attacks*, the accused has forever broken up a family. You can't blame [AJ] for leaving in November. Good for her, recognizing that she deserves better." (Emphasis added).

#### b. Analysis

Appellant argues his son was not a named victim to any specification nor was there evidence that Appellant harmed his son. The Government answers, conceding Appellant's son was not a named victim, but explaining it does not follow that his son was not affected by Appellant's crimes against his mother, AJ. The Government points out that Appellant's son "no doubt observed the beginning of the incident" in his bedroom in May 2017. At the same time, the Government concedes "it is unclear whether [the son] witnessed (or heard) the violent assault that took place outside his door in the hallway." For support the Government explains that AJ and Appellant both testified how the incident began with an argument in their son's bedroom. After AJ called Appellant a "b[**]ch," he went into "a rage" and dragged her out of the room by the right forearm with enough force to leave marks that were still visible at trial. Appellant described the beginning of the incident as a "back and forth like two little kids."

Trial counsel's remarks would be improper if she argued facts not in evidence. *Baer*, 53 M.J. at 237 (explaining trial counsel may argue "the evidence of record" and "all reasonable inferences"). Even if trial counsel had license to argue the inference that Appellant's son witnessed the start of the incident in his bedroom, it is not reasonable to conclude that the son experienced "all the trauma" from Appellant's "attacks," unlike his mother who did. *Cf. Fletcher*, 62 M.J. at 180 (trial counsel cannot argue irrelevant matters such as personal opinions and facts not in evidence). On the other hand, the comment could be understood to suggest that the members impute at least some trauma to the son. It is not unreasonable to infer some amount of trauma to a child of tender years who is in the presence of violence committed on a parent, close relative, or caregiver.

We find trial counsel's reference to Appellant's son was not plainly off-limits or as improper as Appellant claims. Appellant's brief acknowledges "a significant focus of Appellant's sentencing case was the strong, caring relationship he shared with his son." As a whole, Appellant portrayed himself as a devoted father to the exclusion of any acknowledgement of his behavior in the presence of his son. It was not improper for trial counsel to paint a contrast in his relationship with his son, as depicted by Appellant, by pointing out that he initiated the attacks against AJ in the son's bedroom and while his son was present. The members were certain to recall AJ's testimony that the violence began after Appellant blocked her from saying goodnight to their son. During sentencing argument, trial counsel is permitted to argue "the nature and circumstances of the offense and the history and characteristics of the accused." R.C.M. 1001(h); R.C.M. 1002(f)(1). We agree with the Government that it was fair rebuttal for trial counsel to argue the adverse impact of Appellant's offenses on family, and by extension, his son.[43] We decline to find clear or obvious error under a plain error standard of review.

Even if we assume that part of trial counsel's argument was improper, it was just one statement in the context of the overall record, *Webb*, 38 M.J. at 65, and was hardly a reference trial counsel focused on. After trial counsel made the comment, she did not revisit the issue again. The members were well aware Appellant had not committed an offense against his son. The lack of defense objection is some measure of the minimal prejudicial impact of the remark. *See Gilley*, 56 M.J. at 123. We are confident that even without an objec-

---

[43] The Defense similarly argued the impact of lengthy confinement on Appellant's relationship with his son. Trial defense counsel explained, "Boys need their dads, now more than ever. . . . You saw the tears in [Appellant's] mom's eyes as she's thinking about the plight of her son, what's going to happen to [Appellant], thinking about the plight of her grandson."

tion, the members put the argument of impact to Appellant's son in the appropriate context of evidence that was presented, and that Appellant was sentenced on the basis of the evidence alone—not trial counsel's assigning of an unspecified impact to the son that belonged to AJ.

Taken as a whole, the court finds trial counsel's argument, even if error, was not so damaging that the court cannot be confident Appellant was sentenced on evidence alone. *Erickson*, 65 M.J. at 224. Appellant was not prejudiced by trial counsel's remark, and thus we find no error under a plain error standard of review, much less material error to a substantial right.

**D. Sentencing Instruction**

Appellant claims the military judge erred by instructing the members in sentencing that they will not draw any adverse inference from Appellant's election to make statements that were not under oath. The military judge asked the Defense whether it wanted this instruction and the Defense replied it did not. Appellant asks the court to set aside his sentence. We decline to do so.

**1. Background**

In a session held outside the presence of members under Article 39(a), UCMJ, 10 U.S.C. § 839(a), the military judge had a preliminary discussion about sentencing instructions with counsel for both parties. The military judge asked the Defense whether it "wish[ed] an instruction regarding the fact that the accused did not testify under oath in sentencing?" Trial defense counsel replied in the negative, and the military judge agreed he would "take that out" and then recessed court.

When court was back on the record, the military judge asked both counsel if they had received his draft instructions and, after confirming they were received, he asked if there were "[a]ny objections?" Both counsel answered in the negative, with trial defense counsel replying, "No, Your Honor, no objection." The military judge proceeded to advise the members on the law that governed their deliberation and voting on a sentence. As regards Appellant's allocution in sentencing, the members were advised they "will not draw any adverse inference from the fact that the accused has elected to make a statement which is not under oath." He further advised that "[a]n unsworn statement is an authorized means for an accused to bring information to the attention of the Court, and must be given appropriate consideration."[44]

---

[44] As part of his instruction on the unsworn statements given by Appellant and two victims, the military judge further explained that

At the conclusion of these instructions, the military judge asked counsel for both parties if there were "[a]ny objections to those instructions up to this point?" Trial defense counsel responded, "No, Your Honor." After arguments by counsel, the military judge gave further instructions to the members and asked whether "counsel object to the instructions given or request any additional instructions?" Both counsel answered, "No, Your Honor."

**2. Law and Analysis**

Although the omission of the requested instruction was apparently due to the military judge's oversight—and the absence of a defense objection was the product of a similar oversight on trial defense counsel's part (unless counsel changed their minds)—Appellant had ample opportunity to review and object to the instructions. To begin with, the court cannot reliably determine the content of the draft instructions that were delivered to the parties for review before coming back on the record. Nonetheless, trial defense counsel twice stated that the Defense did not object to the instructions as given on the record, which included the disputed instruction at issue on appeal. Appellant affirmatively waived appellate review of the disputed instruction by neither objecting to the instruction as given nor requesting additional instructions after having been prompted by the military judge as to whether there were any objections or any desire for additional instructions. At separate times, Appellant twice conceded to the instructions before the members began their deliberations. *See, e.g.*, *United States v. Wall*, 349 F.3d 18, 24 (1st Cir. 2003) ("[C]ounsel twice confirmed upon inquiry from the judge that he had 'no objection and no additional requests.' Having directly bypassed an offered opportunity to challenge and perhaps modify the instructions, appellant waived any right to object to them on appeal."), *quoted in United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020).

Because trial defense counsel affirmatively declined to object to the final instructions and offered no additional instructions, Appellant expressly and unequivocally acquiesced to the instructions that were given, and the decisions of counsel thus constitute waiver. *See United States v. Rich*, 79 M.J. 472, 476–

---

[a] person making an unsworn statement can't be cross-examined by the prosecution or the defense, or interrogated by court members or me. However, evidence may be offered to rebut those statements of fact contained in unsworn statements. Again, the weight and significance to be attached to an unsworn statement rests within the sound discretion of each court member. You may consider that the statement is not under oath, its inherent probability or improbability, whether it's supported or contradicted by evidence in the case, as well as any other matter that might have a bearing upon its credibility. In weighing an unsworn statement, you are expected to use your common sense, your knowledge of human nature, and the ways of the world.

77 (C.A.A.F. 2020) (finding waiver of findings instruction where the appellant specifically discussed a potential instruction but failed to request it). To be clear, Appellant did not just fail to object to the disputed instruction, which would trigger plain error review; Appellant waived appellate review on this issue. *See, e.g.*, *United States v. Blanks*, 77 M.J. 239, 241 (C.A.A.F. 2018).

The court finds no compelling reason to pierce Appellant's waiver. *See United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018); *see also United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016) (addressing this court's Article 66, UCMJ, responsibility to "assess the entire record to determine whether to leave an accused's waiver intact, or to correct the error"). We reach this conclusion because the military judge did not plainly err despite Appellant's argument to the contrary that he did. We consider Appellant's reliance on *United States v. Forbes*, in which the CAAF held that a military judge commits error by instructing members over defense objection to disregard the accused's silence when the accused does not testify in the defense findings case. 61 M.J. 354, 359 (C.A.A.F. 2005). We also consider Appellant's reliance on Mil. R. Evid. 301(f)(3), which states,

> When the accused does not testify at *trial*, defense counsel may request that the members of the court be instructed to disregard that fact and not to draw any adverse inference from it. Defense counsel may request that the members not be so instructed. *Defense counsel's election will be binding upon the military judge* except that the military judge may give the instruction when the instruction is necessary in the interests of justice.

(Emphasis added).

Appellant argues the plain text of Mil. R. Evid. 301(f)(3) uses the word "trial" and does not distinguish between findings or sentencing portions of a court-martial. In reply to the Government's answer, Appellant likewise argues "nothing within the text of Mil. R. Evid. 301(f)(3) indicates it is limited to findings." It follows, Appellant contends, his election to not have the disputed instruction given in sentencing was just as binding upon the military judge as it would have been if Appellant had made the election in the findings portion of his court-martial. We disagree with Appellant's understanding of the scope of the rule.

Appellant's reliance on *Forbes* and Mil. R. Evid. 301(f)(3) is inapt. Unlike *Forbes*, the disputed instruction here was in the sentencing portion of the court-martial. At the same time, the word "trial" where it appears in Mil. R. Evid. 301(f)(3) is not synonymous with "court-martial." Appellant's *trial* concluded when findings were announced: "the line of demarcation that separates the 'trial' stage of a court-martial and the 'after trial' stage of a court-martial

is the moment of time '*before findings and sentence.*' . . . Thus, as soon as the finder of fact announces a guilty verdict . . . the trial has ended . . . ." *United States v. Turner*, 79 M.J. 401, 405 (C.A.A.F. 2020) (quoting *United States v. Watkins*, 21 M.J. 208, 209 (C.M.A. 1986)). For this reason, Mil. R. Evid. 301(f)(3) applies in the findings stage of courts-martial, but not in sentencing. In this regard, the plain text of the rule leads to a different result than one Appellant urges the court to reach.

Both the holding in *Forbes* and Mil. R. Evid. 301(f)(3) have their genesis in the United States Supreme Court's decision in *Lakeside v. Oregon*, 435 U.S. 333 (1978). *See Forbes*, 61 M.J. at 356 (citing *Manual for Courts-Martial, United States* (2002 ed.), App. 22, Analysis of the Military Rules of Evidence, at A22–7). In *Lakeside*, the Supreme Court held "that the giving of such an instruction over the defendant's objection does not violate the privilege against compulsory self-incrimination guaranteed by the Fifth and Fourteenth Amendments." *Id.* at 340–41. Nonetheless, the Court also stated "[i]t may be wise for a trial judge not to give such a cautionary instruction over a defendant's objection." *Id.* at 340. The provisions in Mil. R. Evid. 301(f)(3) were the result.[45] Although the rule "reflects the President's authority to grant members of the armed forces rights more protective than those required by the Constitution," *Forbes*, 61 M.J. at 356, it had no more application to the sentencing portion of Appellant's court-martial than the holdings of *Lakeside* and *Forbes*.

We find piercing waiver inappropriate, moreover, because Appellant has not shown prejudice, much less a presumption of prejudice. *But cf. Forbes*, 61 M.J. at 359 (presuming prejudice results when military judge errors by instructing members over defense objection to disregard the accused's silence when the accused does not testify in the defense findings case). The military judge's sentencing instruction was a correct statement of the law. Importantly, the members were instructed, without objection, that the unsworn statements Appellant gave were "an authorized means for an accused to bring information to the attention of the Court, and must be given appropriate consideration." *See United States v. Breese*, 11 M.J. 17, 23 (C.M.A. 1981) (holding instructions "provided the court members with correct and sufficient guidance needed in considering the appellant's unsworn statement").

Even if the disputed instruction had not been given, the members were already aware Appellant's testimony during sentencing was not under oath because it was in direct contrast to the findings portion of the court-martial where he did testify under oath. Appellant contends that he was prejudiced

---

[45] Mil. R. Evid. 301(f)(3) was enumerated "301(g)" in the *Manual for Courts-Martial, United States* (2002 ed.), and is identical in all respects. *See, e.g., Forbes*, 61 M.J. at 356.

because members "were specifically alerted to Appellant's lack of sworn sentencing testimony." However, the court finds no plainer forewarning to the factfinder that his sentencing allocution was not under oath than the label Appellant chose for his written unsworn statement. In capital letters, Appellant conveyed that the statements in that document constituted the "Unsworn Statement of SSgt Mariano L. Jackson for the Honorable Court."

Under the circumstances, we find comparison with the presumption of prejudice in *Forbes* is inapt, and relief is not warranted. We find no merit to this issue.

### E. Convening Authority's Decision on Action

Appellant urges the court to remand his case to the Chief Trial Judge of the Air Force to resolve a substantial issue with the convening authority's failure to take action on the sentence. We are not persuaded relief is warranted and decline to do so.

#### 1. Background

Appellant was sentenced to a bad-conduct discharge, confinement for three years, reduction to the grade of E-1, and a reprimand. In the convening authority's 2 April 2020 Decision on Action memorandum, he noted that he had not previously granted any deferment of forfeitures. At the same time, the convening authority granted Appellant's request to waive automatic forfeitures for the benefit of Appellant's dependent child, and specified the language of the reprimand. The convening authority took no further action on Appellant's sentence by, for example, indicating that he approved any portion of Appellant's sentence. Appellant did not object to the convening authority's decision before submitting his assignments of error to the court. *See* R.C.M. 1104(b).

#### 2. Law and Analysis

Appellant was found guilty of misconduct he committed between 1 May 2016 and 25 April 2019. Because Appellant was convicted of at least one specification involving an offense before 1 January 2019, the convening authority was required to approve, disapprove, commute, or suspend the sentence of the court-martial in whole or in part. *United States v. Brubaker-Escobar*, 81 M.J. 471, 472 (C.A.A.F. 2021) (per curiam); *see also* Article 60, UCMJ, 10 U.S.C. § 860 (*Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*).

However, the convening authority did not take one of these four actions on each component of the adjudged sentence. It follows, then, that the convening authority made a procedural error when he failed to act on the sentence. *Brubaker-Escobar*, 81 M.J. at 474–75 (holding that the convening authority erred by taking "no action"). In line with Article 59(a), UCMJ, 10 U.S.C. § 859(a), "procedural errors are 'test[ed] for material prejudice to a substantial right to

determine whether relief is warranted.'" *Id.* at 475 (alteration in original) (quoting *United States v. Alexander*, 61 M.J. 266, 269 (C.A.A.F. 2005)).

Appellant and the Government are in agreement that the court reviews the convening authority's decision under a plain error standard of review, which we accept for purposes of this appeal. Under plain error review an appellant must demonstrate: (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right. *United States v. Scalo*, 60 M.J. 435, 436 (C.A.A.F. 2005) (reviewing appellant's failure in his clemency submission to the convening authority to comment on omission in a staff judge advocate's recommendation).

The court examined the convening authority's Decision on Action memorandum and, testing for material prejudice, finds relief is not warranted. To begin with, the convening authority was powerless to grant clemency on the adjudged findings, Article 60(c)(3)(A), UCMJ, 10 U.S.C. § 860(c)(3)(A) (2016 *MCM*). As to sentence, the convening authority was not authorized to disapprove, commute, or suspend the adjudged confinement or bad-conduct discharge. *See* Article 60(c)(4)(A), UCMJ, 10 U.S.C. § 860(c)(4)(A) (2016 *MCM*) ("[T]he convening authority . . . may not disapprove, commute, or suspend in whole or in part an adjudged sentence of confinement for more than six months or a sentence of . . . [a] bad[-]conduct discharge."). Nonetheless, the convening authority had the power to disapprove, commute, or suspend, in whole or in part, the reprimand and reduction in grade. *See* Articles 60(c)(2), (c)(4), UCMJ, 10 U.S.C. §§ 860(c)(2), (c)(4) (2016 *MCM*). The words of the reprimand are specified in the memorandum, so we are confident the convening authority intended to approve it despite the procedural error.

Turning then to the reduction in grade from E-5 to E-1, the court again tests for material prejudice and finds none. Trial defense counsel submitted clemency matters on behalf of Appellant, asking the convening authority to waive automatic forfeitures for the benefit of Appellant's son. Appellant did not seek modification of the reduction in grade. The convening authority could have modified this sentence component, but it is speculative to conclude such relief would have been granted, much less in the absence of a specific request. The convening authority rebuked Appellant in the reprimand, observing his "actions . . . *cost [him his] position as a professional noncommissioned officer* of integrity and character in the United States Air Force." (Emphasis added). Such an action lends support to the conclusion that the convening authority did not intend to disturb the adjudged reduction in grade. Also, Appellant makes no argument on appeal that he was prejudiced by the convening authority's failure to either approve, disapprove, commute, or suspend the grade reduction in whole or in part. Considering the totality of the circumstances, we

find no material prejudice to Appellant's substantial rights owing to the procedural error.[46]

## F. Convening Authority's Reprimand of Appellant

Appellant contends that the language in the convening authority's reprimand included improper comments on Appellant's defense at trial and rights against self-incrimination. Appellant claims that the language renders the reprimand inappropriately severe and violates Appellant's rights under the Fifth and Sixth Amendments and Article 37, UCMJ.[47] As a remedy, Appellant requests the court set aside the reprimand. The court finds relief is not warranted on this issue.

### 1. Background

The members sentenced Appellant on 9 March 2020 and imposed a sentence that included a reprimand. On 2 April 2020, the convening authority issued that reprimand in his Decision on Action memorandum. In that memorandum, the convening authority censured Appellant for downplaying the injuries he caused AJ and KM and failing to take responsibility for his actions:

> You have been made aware countless times over the course of your career that domestic violence is both abhorrent and illegal. The fact that you strangled two women you supposedly loved is so cowardly and reprehensible that I struggle to find words powerful enough for a rebuke. This is made even more difficult because you physically assaulted your loved ones just steps away from your child! Given the tearful statements these women made during your sentencing hearing, it is clear that the damage you inflicted upon them is irreparable. *That you had the audacity to downplay their obvious physical and emotional harm is not only repugnant, it demonstrates that you feel neither shame nor*

---

[46] Two judges of the panel find the convening authority's intent can be gleaned from the words in the Decision on Action memorandum and the Air Force guidance in effect when the convening authority made his decision not to disturb the sentence. "[A] decision to take no action is tantamount to granting no relief." AFI 51-201, *Administration of Military Justice*, ¶ 13.17.1. (18 Jan. 2019). To be sure, the convening authority followed that instruction to his detriment by failing to take action on each component of the sentence. Even so, the memorandum unmistakably conveys an intention to grant no sentencing relief to Appellant despite the procedural error.

[47] All references to Article 37, UCMJ, 10 U.S.C. § 837, or its subparagraphs, are to the version in effect to allegations of unlawful command influence committed on, or after, 20 December 2019 with enactment of the National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116–92, § 532 (2019).

*regret over your actions.* Accordingly, you are hereby repri-
manded!

As a noncommissioned officer in the United States Air Force, you
are expected to maintain a standard of professional and personal
behavior that is beyond reproach. Every action you take should
serve as a model to your peers, subordinates, and fellow [A]ir-
men. Instead, your actions jeopardized the physical and mental
health of your family, and cost you your position as a profes-
sional noncommissioned officer of integrity and character in the
United States Air Force. Although *you have inexplicably failed
to take responsibility for your actions thus far*, I trust your time
in confinement will give you ample opportunity to reflect on your
conduct and adjust your behavior to comport with that expected
of each member of our society. I can only hope that your confine-
ment will also bring your loved ones comfort, knowing that some
measure of justice has been served.

(Emphasis added).

Trial defense counsel received a copy of the convening authority's decision
memorandum the same day it was issued. Trial defense counsel did not file a
post-trial motion alleging that the convening authority erred in the language
of the reprimand. Instead, Appellant alleges error for the first time on appeal.

### a. Appellant's Testimony

As noted above, Appellant testified during the defense case-in-chief. He was
resolute in denying that he had committed many of the offenses under review.
He asserted he had not engaged in the charged conduct underlying the assaults
consummated by battery upon AJ or KM. He likewise disclaimed any actions
on his part could have caused their injuries. On cross-examination, Appellant
maintained his denials when trial counsel confronted him with pictures, expert
testimony, and other evidence of specific injuries.

As relevant to Appellant's claim of error in the language of the reprimand,
trial counsel and Appellant engaged in a colloquy about testimony given by AJ
and KM. After establishing that Appellant was present when AJ and KM tes-
tified, trial counsel directed Appellant to recall each victim's sworn testimony:

Q [Trial counsel]. You saw the emotion on [KM]'s face, right?

A [Appellant]. *During portions of her story, yes, sir.*

Q. You saw the emotion that your wife [AJ] showed when she
was talking about that laundry room incident?

A. *I didn't see any emotion.*

Q. *You didn't see her wiping away tears?*

A. *No, sir.*

Q. Okay. But your testimony now today is that everything they said is made up?

A. Portions of it, yes, sir.

Q. Namely, the allegations that make you a criminal?

A. Certain things, yes, sir.

. . . .

Q. So . . . *[KM] is making up the strangulation?*

A. *Yes, sir.*

Q. *She's making up being choked on the floor while she's smacking the door, hoping your neighbors will hear?*

A. *Yes, sir.*

Q. *She's making up the sound that she made when she was trying to breathe?*

A. *Yes, sir.*

Q. Okay. *All of that's made up? . . .* From both February and April?

A. *Yes, sir.*

(Emphasis added).

### b. Trial Defense Counsel's Sentencing Argument

During sentencing argument, like during Appellant's findings testimony, trial defense counsel maintained that AJ and KM had exaggerated their injuries when they testified. Trial defense counsel similarly challenged the veracity of the unsworn statements each woman presented in sentencing. In this regard, counsel told the members, "I'm going to talk about some things and, basically, distill it down to what did [AJ] actually do . . . ."

Before making a case that AJ and KM had been untruthful, trial defense counsel explained their injuries did not warrant lengthy confinement. Specifically as regards the Government's sentencing argument, Appellant's counsel argued their injuries were not so serious as to warrant the eight years of confinement that trial counsel recommended.

Trial defense counsel challenged this recommendation, explaining that "[n]ot all offenses are created equal." He argued "[t]here's a spectrum, right,

from the non-offense to something very minor, to the most egregious, most heinous acts that you can even imagine on the other end." In this regard, counsel began at the upper end of that spectrum, reminding the members of expert testimony they heard about "the things [that the experts have] seen in strangulation cases," such as "deaths," "broken necks," and "broken discs."

Trial defense counsel sought to convince the members that, "[f]rankly speaking, what we have in this case is on the other end" of the spectrum. He advocated that AJ's and KM's injuries were "minor," even "superficial." The injuries, counsel maintained, did not merit lengthy confinement or separating Appellant from his son for eight years. In this regard, he explained,

> And *I'm not belittling, or downplaying, or trivializing this at all*, and I hope that it's not coming across that way, members, but we have to be real about what this case entailed. It entailed some assaults that involved strangulation. What were the injuries here, the physical injuries? With [AJ], it was redness that the nurse said would dissipate immediately, no medical intervention necessary that was testified about. With [KM], the injuries were superficial. They were minor, they went away after a couple of days. You heard testimony about that CAT[48] scan . . . they do that to look inside the structure of the neck to see if there was any internal damage, and there wasn't. They have soreness that lasted a few days, and that was it. Not strangling nearly to death, as trial counsel said; not life draining out of them, as trial counsel said; not torture that trial counsel said. Let's be precise in our language, members. Let's be precise about what we're talking about here. Serious, absolutely, but not over here on that spectrum warranting eight years of his life, eight years without his son.

(Emphasis added).

Trial defense counsel then challenged the veracity of the testimony AJ and KM gave at trial, and the impacts they described in their unsworn statements given in sentencing. Appellant's counsel reminded the members they had "heard about impacts" to both women in those statements, and told the members to contrast those claims with the testimony they heard in the findings portion of the court-martial:

> But think about the testimony that you've heard in this case about lasting impacts on them. I mean, I'm sure none of us would

---

[48] Computed axial tomography (CAT).

ever want to go through that -- go through what they did. Absolutely, it should be considered, but as far as lasting impacts go, both of these women continued to want to be with him.

On this point, trial defense counsel attacked AJ's credibility, stating she "stuck with [Appellant], and she wanted to make it better." He argued her true motive in staying was a "join[-]spouse assignment [with Appellant] in Germany," and not to work on their marriage as she said in her testimony. At the same time, Appellant's counsel implied that the victim impact AJ described was not credible because, among other reasons, AJ shared custody with Appellant and trusted him with the care of their son. Twice, Appellant's counsel asked rhetorically, "Is that consistent with what [AJ]'s telling you here?" The clear implication of trial defense counsel's argument is that evidence AJ gave, which could be interpreted as "lasting impacts," was false because she would not have trusted Appellant to be around their son if it were true.

In regard to KM, trial defense counsel argued,

> There's been no evidence of counseling or long-term emotional issues in her case. I'm talking about [KM]. You heard that even while [Appellant] was in pretrial confinement, they were talking on the phone and having discussions. She loved him. And, again, no discussion of counseling or long-term emotional issues.

Appellant's counsel concluded this part of the argument by stating, "So, members, *I'm not downplaying what happened*, absolutely not, but you have to be real about what this case is and what it deserves." (Emphasis added).

**2. Law**

A reprimand is among the punishments that a court-martial may adjudge as an authorized sentence. R.C.M. 1003(b)(1). "A court-martial shall not specify the terms or wording of a reprimand." *Id*. If imposed, the reprimand "shall be issued, in writing, by the convening authority." *Id*. "A reprimand adjudged by a court-martial is a punitive censure." *Id*. Discussion.

Appellant and Government are again in agreement that the court reviews the convening authority's decision under a plain error standard of review, which we accept for purposes of this appeal. Under plain error review an appellant must demonstrate: (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right. *Scalo*, 60 M.J. at 436. If a military appellate court finds prejudicial error, it may set aside inapt language in a reprimand. *See United States v. Hawes*, 51 M.J. 258, 261 (C.A.A.F. 1999) (setting aside words that reference a conviction which was dismissed on appeal).

### 3. Analysis

#### a. Convening Authority's Reprimand of Appellant

The convening authority censured Appellant for having "the audacity to downplay" the injuries he caused AJ and KM and that he "failed to take responsibility" for his actions. In the convening authority's view, Appellant felt "neither shame nor regret" for his assaults consummated by a battery upon either woman.

Appellant argues the reprimand's language improperly denounced him for exercising rights afforded him under the Fifth and Sixth Amendments. In Appellant's telling, the convening authority "reprimanded Appellant for putting on a defense and maintaining his constitutional and statutory rights against self-incrimination after having pled not guilty." In Appellant's view, the reprimand conveys that the convening authority "*would* hold it against any member under his authority [at the USAFA] if they invoked their constitutional right to plead not guilty" and "and put on a defense." Appellant continues,

> In so doing, the [convening authority] did not fault [him] for lying under oath or even insinuate that he did so;[49] [the convening authority] took [him] (and by extension his defense counsel) to task for merely putting on a defense which sought to counter and mitigate the charges brought by the Government—precisely the defense function.

Appellant draws a parallel between trial defense counsel's sentencing argument and the words in the reprimand. During argument, trial defense counsel twice professed he was not "downplaying" Appellant's conduct, which very closely resembled the convening authority's language censuring Appellant for having the audacity "to downplay" the physical and emotional harm he caused AJ and KM. Appellant claims, "By taking aim at the very nature of the defense [he] put on, [the] reprimand inherently admonished [his] defense counsel as well."

The Government counters that Appellant is not entitled to relief under the plain error standard of review. In the Government's view, the reprimand addresses Appellant's failure to apologize to his victims or express remorse in his unsworn statements. In this regard, the inference that Appellant felt "neither shame nor regret" for his conduct is a reasonable one. Further, in the Govern-

---

[49] Appellant suggests, "Had the [convening authority] styled his reprimand in a manner consistent with a mendacity instruction, this would be a different situation." Noting that a mendacity instruction was given to the members, Appellant observes the convening authority, nonetheless, "never alleged that Appellant lied under oath."

ment's view, the convening authority's observation that Appellant "inexplicably failed to take responsibility" for his "actions thus far" was likewise directed at Appellant's failure to apologize to his victims in his unsworn statements.

Assuming the reprimand could be read to address Appellant's statements in findings, rather than sentencing, the Government argues that the reprimand was still appropriate. Appellant testified in his own defense and denied engaging in the charged conduct. The Government explains that "[t]he members clearly did not believe Appellant as they convicted him on offenses involving both AJ and KM. The military judge also delivered a mendacity instruction based on the lies Appellant admitted to on the stand." Accordingly, it was not clear or obvious error for the convening authority to comment on Appellant's efforts to "downplay" the allegations by denying that they even occurred. In the Government's view, "Appellant's false denial of his culpability in these violent crimes" warrants the reprimand's language that Appellant challenges for the first time on appeal.

Under the circumstances here, the court finds the challenged language was within the discretion of a convening authority and not improper. We note that the reprimand stopped short of stating any of the things Appellant finds concerning. Importantly, it did not expressly censure Appellant or trial defense counsel for exercising a right or decision guaranteed to Appellant by the Constitution or the UCMJ. The convening authority did not impermissibly comment on Appellant's right to confront the witnesses against him at trial or his right to remain silent and force the Government to meet its evidentiary burdens. *Cf. Stephens*, 67 M.J. at 235–36 (distinguishing cases in which trial counsel "explicitly commented" on an appellant's invocation of a constitutional right).

Earlier in this decision the court observed that "an accused's refusal to admit guilt after findings may be an appropriate factor for the member[s'] consideration in their sentencing deliberation on rehabilitation potential but only if a proper foundation has been laid." *Paxton*, 64 M.J. at 487 (citing *Edwards*, 35 M.J. at 355). The court finds this principle, or one like it, reaches a convening authority's reprimand when the accused has either testified or made an unsworn statement that serves as a foundation for fair censure. Just as trial counsel is permitted to argue "the nature and circumstances of the offense and the history and characteristics of the accused," *see* R.C.M. 1002(f)(1); R.C.M. 1001(h), such matters are a proper subject for a reprimand. At the same time, we find a censure may be examined for appropriateness by evaluation of the same principles the members are permitted to observe in sentencing. In this regard, a reprimand aimed to reflect the seriousness of an offense, promote respect for the law, provide a just punishment, promote adequate deterrence

of misconduct, protect others from further crimes by the accused, and to reha-bilitate the accused is generally not in error. *See* R.C.M. 1002(f)(3)(A)–(F).

Here, we again find Appellant established the requisite foundation when he testified in findings and then exercised the right of allocution in sentencing. Applying *Paxton*, *Edwards*, and considerations listed in R.C.M. 1001(h), Appellant has not shown under a plain error standard of review that the convening authority's language used in the reprimand was error. Appellant claims it was improper for the convening authority to look to trial defense counsel's sentencing argument, but Appellant's testimony and unsworn statements lend independent factual support to the language that Appellant objects to in the reprimand. Appellant has not demonstrated he is entitled to relief on this issue and we decline to provide any relief.

### b. Claimed Unlawful Command Influence, Article 37, UCMJ

Among Appellant's claims of error, he asserts that the language of the reprimand renders his sentence inappropriately severe because the specific words violate Article 37, UCMJ, 10 U.S.C. § 837. Appellant directs the court to look no further than trial defense counsel's sentencing argument to find that the reprimand was "necessarily imputed" to trial defense counsel even if it was not specifically directed at them.

An appellate court reviews allegations of unlawful command influence (UCI) de novo. *See United States v. Barry*, 78 M.J. 70, 77 (C.A.A.F. 2018); *United States v. Salyer*, 72 M.J. 415, 423–24 (C.A.A.F. 2013). "Two types of unlawful command influence can arise in the military justice system: *actual* unlawful command influence and the *appearance* of unlawful command influence." *United States v. Boyce*, 76 M.J. 242, 247 (C.A.A.F. 2017). Actual UCI "is an improper manipulation of the criminal justice process which negatively affects the fair handling and/or disposition of a case." *Id*. In order to demonstrate actual UCI, the appellant "must show: (1) facts, which if true, constitute unlawful command influence; (2) that the proceedings were unfair; and (3) that the unlawful command influence was the cause of the unfairness." *Salyer*, 72 M.J. at 423 (citing *United States v. Richter*, 51 M.J. 213, 224 (C.A.A.F. 1999)). "[T]he initial burden of showing potential unlawful command influence is low, but is more than mere allegation or speculation." *Id*.

> Once an issue of unlawful command influence is raised by some evidence, the burden shifts to the government to rebut an allegation of unlawful command influence by persuading the Court beyond a reasonable doubt that (1) the predicate facts do not exist; (2) the facts do not constitute unlawful command influence; or (3) the unlawful command influence did not affect the findings or sentence.

66

*Id.*

If the Government fails to rebut an appellant's factual showing, it may still prevail against a claim of apparent UCI if it proves

> beyond a reasonable doubt that the unlawful command influence did not place "an intolerable strain" upon the public's perception of the military justice system and that "an objective, disinterested observer, fully informed of all the facts and circumstances, would [*not*] harbor a significant doubt about the fairness of the proceeding."

*Boyce*, 76 M.J. at 249–50 (alteration in original) (quoting *Salyer*, 72 M.J. at 423).

Appellant's claim of unlawful command influence is premised on an insinuation that some of the convening authority's words in the reprimand were directed at Appellant's trial defense counsel. He argues, "While the [convening authority] did not specifically direct [the] reprimand language to [trial] defense counsel, the fact that [the convening authority] reprimanded [him] for marshalling a defense (i.e., placing the allegations in perspective), is necessarily imputed" to trial defense counsel. The court understands Appellant's claim to be that the convening authority reprimanded Appellant as a proxy for trial defense counsel; and, by doing so, the convening authority violated Article 37(a), UCMJ, which, prohibits a convening authority from reprimanding counsel with respect to their official duties in the conduct of a court-martial proceeding. *See* 10 U.S.C. § 837(a); *see also* R.C.M. 104(a)(1).

The court finds this argument is without merit. First, the court can determine that the reprimand was directed at Appellant and not counsel from its language. Second, we can determine from the context of the record that the language the convening authority used to censure Appellant has independent support in Appellant's own testimony and unsworn statements, as discussed earlier in this opinion. Third, it is little more than speculation that the convening authority was holding counsel accountable for the "exercise of . . . his functions in the conduct of the proceeding," Article 37(a)(1), UCMJ, 10 U.S.C. § 837(a)(1), as claimed, and not Appellant's sworn and unsworn statements in which he minimized the conduct underlying his convictions while he simultaneously denied that any action on his part caused injury to the victims. Finally,

Appellant makes no claim that he was materially prejudiced by the reprimand's language as required by Article 37(c), UCMJ, 10 U.S.C. § 837(c).[50] Instead, Appellant claims that the language is inappropriate. In this regard, Appellant emphasizes in his reply brief that his "overarching claim is one of sentence appropriateness, which is reviewed de novo," and not material prejudice to a substantial right.

We find Appellant has not demonstrated some evidence of facts, which if true, would constitute UCI. *Salyer*, 72 M.J. at 423; *cf. Ginn*, 47 M.J. at 248 (holding that an appellant's ineffective assistance of counsel claim "may be rejected on [the] basis" that his declaration "consists . . . of speculative or conclusory observations"). We find no evidence of "an improper manipulation of the criminal justice process which negatively affect[ed] the fair handling and/or disposition of [Appellant's] case." *Boyce*, 76 M.J. at 247 (citing *United States v. Allen*, 33 M.J. 209, 212 (C.M.A. 1991)).

For these reasons the court is convinced beyond a reasonable doubt that the facts as presented do not support an actual or apparent violation of Article 37(a), UCMJ, because those facts do not constitute UCI. *Salyer*, 72 M.J. at 423. We are also certain beyond a reasonable doubt that a fully informed, objective, disinterested observer would not harbor any significant doubt about the fairness of the proceeding. *Id*. We conclude that the reprimand is not an inappropriately severe penalty as claimed, Article 66(d)(1), UCMJ, and that relief is not warranted on this issue.

### G. Timeliness of Post-Trial Processing and Appellate Review

The court considers two issues that relate to Appellant's right to a timely post-trial proceeding. First, Appellant asks this court to reassess the adjudged sentence because of the Government's 176-day delay in docketing Appellant's case with the court. Appellant emphasizes he is entitled to a presumption of unreasonable delay because the record was docketed 26 days after the 150-day standard that this court established in *United States v. Livak*, 80 M.J. 631 (A.F. Ct. Crim. App. 2020). Appellant does not contend that this delay rose to the level of a due process violation, but does request relief pursuant to *United States v. Tardif*, 57 M.J. 219 (C.A.A.F. 2002). The court, nonetheless, assesses both grounds for relief. Second, although not raised by Appellant, the court considers the issue of timely appellate review. We are not persuaded Appellant is entitled to relief for post-trial delay, including delay during the appellate review of his case.

---

[50] "No finding or sentence of a court-martial may be held incorrect on the ground of a violation of [Article 37, UCMJ,] unless the violation materially prejudices the substantial rights of the accused." Article 37(c), UCMJ, 10 U.S.C. § 837(c).

**1. Law**

Whether an appellant has been deprived of his due process right to speedy post-trial and appellate review, and whether constitutional error is harmless beyond a reasonable doubt, are questions of law reviewed de novo. *United States v. Arriaga*, 70 M.J. 51, 56 (C.A.A.F. 2011) (citing *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006)). In *Moreno,* the CAAF's holding quantified the threshold for a presumptive due process violation that it measured in days and months when any of the following occur: (1) the convening authority takes action more than 120 days after completion of trial; (2) the record of trial is docketed by the service CCA more than 30 days after the convening authority's action; or (3) a CCA completes appellate review and renders its decision more than 18 months after the case is docketed with the court. *Moreno*, 63 M.J. at 142.

As Appellant's case was processed under new procedural rules, this court applies *Livak*'s 150-day aggregate standard threshold. 80 M.J. at 633. In *Livak*, we deduced this aggregate standard from standards announced by our superior court in *Moreno*. *Id.* We quantified the threshold for a presumptive due process violation when a record of trial is untimely docketed with the court under the new rules. *Id.* We determined such delay is presumptively unreasonable when docketing occurs more than 150 calendar days after sentencing. *Id.* (finding a "150-day threshold appropriately protects an appellant's due process right to timely post-trial and appellate review and is consistent with our superior court's holding in *Moreno*").

When a case does not meet this standard, the delay is presumptively unreasonable and it triggers an analysis of the four non-exclusive factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135. These factors are used to assess whether an appellant's due process right to timely post-trial and appellate review has been violated. *Id.*; *but see United States v. Anderson*, 82 M.J. 82, 90 (C.A.A.F. 2022) (Maggs, J., concurring) ("In the light of the new guidance from [the Supreme Court], courts in other jurisdictions have recognized that they may have to reexamine how they apply the *Barker* factors in analyzing claims that post-conviction delay has violated due process.").[51]

---

[51] Appellant's case raises at least one other question about the suitability of applying standards articulated in *United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006), to this case, founded as they are on our superior court's analogy to the pretrial speedy trial context in *Barker v. Wingo*, 407 U.S. 514, 530 (1972). In *Barker*, the Supreme Court observed, if not cautioned, that "the length of delay that will provoke" a full inquiry "is

*Moreno* identified three types of prejudice arising from post-trial processing delay: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of a convicted person's grounds for appeal and ability to present a defense at a rehearing. 63 M.J at 138–39.

"We analyze each factor and make a determination as to whether that factor favors the Government or the appellant." *Id.* at 136. Then, we "balance our analysis of the factors to determine whether . . . a due process violation" occurred. *Id.* "[C]ourts must still engage in a difficult and sensitive balancing process." *Barker,* 407 U.S. at 534. "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Moreno,* 63 M.J. at 136. However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

In the absence of a due process violation, a CCA has a responsibility under Article 66, UCMJ, "to grant relief for excessive post-trial delay without a showing of 'actual prejudice' within the meaning of Article 59(a)[, UCMJ,] if it deems relief appropriate under the circumstances." *Tardif*, 57 M.J. at 224 (citation omitted). To determine if *Tardif* relief is warranted, we consider the factors announced in *United States v. Gay*, 74 M.J. 736 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016). Those factors include how long the delay exceeded standards, the reasons for the delay, whether the Government acted with bad faith or gross indifference, evidence of institutional neglect, harm to the appellant or to the institution, whether relief is consistent with the goals of both justice and good order and discipline, and whether this court can provide meaningful relief. *Id.* at 744.

### 2. Timeliness of Post-Trial Processing

---

necessarily dependent upon the peculiar circumstances of the case." *Barker*, 407 U.S. at 530–31. To illustrate this point, the Supreme Court explained "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Id.* at 531. It must be remembered that Appellant defended against the charge of attempted murder. Though Appellant was acquitted of that charge, even so the unusually lengthy record of trial and the extent to which other issues were litigated on appeal should generate considerable uncertainty whether the fixed *Moreno* standards are "reasonable period[s] consistent with constitutional standards," *id.* at 523, under the particular circumstances of this case and others like it. Nonetheless, we dutifully abide by our superior court's *Moreno* holding.

We determine relief is not warranted for untimely post-trial processing. Applying the first two *Barker* factors, we find the length of the delay counts just slightly in Appellant's favor. The 26-day delay beyond the 150-day standard is presumptively unreasonable, *see Livak*, 80 M.J. at 633, but hardly excessive. *Cf. Moreno*, 63 M.J. at 133, 144 (setting aside the findings and sentence, in part, because 208 days elapsed between sentencing and authentication of the record, 490 days later the convening authority took action, and 76 days later the case was docketed with the CCA). The reasons for the delay count in Appellant's favor. Between adjournment and docketing, the Government compiled a 14-volume record of trial that included a 2,218 page transcript.[52] *Cf. Moreno*, 63 M.J. at 133 (involving a 746-page record of trial). The delay was due, in part, because the court reporter was transcribing another case for two months before preparing the record of Appellant's court-martial. Applying the third and fourth *Barker* factors, trial defense counsel did request speedy post-trial processing on behalf of Appellant in the clemency submission to the convening authority on 18 March 2020, which weighs in favor of Appellant. However, Appellant fails to articulate any prejudice, which weighs significantly in favor of the Government. The *Barker* factors favor the Government overall, and for this reason relief is not warranted.

Nevertheless, recognizing the court's authority under Article 66(d)(1), UCMJ, we considered whether relief for post-trial delay is appropriate in this case even without a due process violation. *See Tardif*, 57 M.J. at 225 ("Appellate relief under Article 66[ ] should be viewed as the last recourse to vindicate, where appropriate, an appellant's right to timely post-trial processing and appellate review."). At the outset, we reject Appellant's invitation for the court to consider alleged "Government[ ] discovery violations and other matters which led to a *pretrial* delay of Appellant's case." (Emphasis added). Appellant cites no authority for considering pretrial delay in a *Tardif* analysis and we find none.[53] Applying the *Gay* factors, the court finds the length and reasons for the delay are reasonable. In this regard, the court finds no bad faith or gross indifference in the reasons for the delay, much less evidence of institutional neglect. There is no evidence of personal or institutional harm as a result of the 26-day

---

[52] Five and a half volumes of the record, which comprise 1,691 pages of transcript, involve trial and sentencing proceedings that took place between 2 and 9 March 2020.

[53] To be sure, both *Tardif* and *Moreno* analogized pretrial speedy trial considerations and applied them in the context of claims of post-trial delay. *Moreno*, 63 M.J. at 135; *Tardif*, 57 M.J. at 222. However, it does not follow that relief for claims of pretrial delay are cognizable under *Tardif* or *Moreno*. If principles of waiver and fairness were the court's guide, it would seem most appropriate that an appellant first litigate such claims before arraignment to develop the record. In most cases, an appellant's first opportunity to litigate claims of post-trial delay is on appeal.

delay, and Appellant makes no showing that granting sentencing relief under the circumstances would be consistent with the goals of both justice and good order and discipline. The *Gay* factors favor the Government overall, and for this reason *Tardif* relief is not warranted.

### 3. Timeliness of Appellate Review

Appellant's case was docketed with the court on 1 September 2020. The overall delay in failing to render this decision by 1 March 2022, less than three months after the 18-month *Moreno* standard, is facially unreasonable. *See Moreno*, 63 M.J. at 142 (determining a presumption of unreasonable delay exists when a CCA issues its decision more than 18 months after the case is docketed with the court). However, we determine there has been no violation of Appellant's right to due process and a speedy appellate review.

Analyzing the *Barker* factors, we find the delay is not excessively long. After docketing, the court granted nine enlargements of time—eight for Appellant and one for the Government—for appellate counsel to prepare briefs in support of the claimed errors and the answer.[54] The amount of time required by Appellant's military defense counsel to effectively and professionally review the trial proceedings and assert assignments of error and issues on Appellant's behalf was understandably much more than would be required in a typical case with many fewer assignments of error. Likewise, the Government reasonably required more time to fully analyze and effectively and professionally respond to Appellant's brief. *Cf. United States v. Moreno*, No. 200100715, 2004 CCA LEXIS 118, at *1–2 (N.M. Ct. Crim. App. 13 May 2004) (unpub. op.) (reviewing "appellant's four summary assignments of error, and the Government's response"), *rev'd*, 63 M.J. at 137, 144 (setting aside the findings and sentence, in part, because the longest delay in the case, 925 days, was the period of time after docketing but before briefing was complete).

Among the reasons for the delay, in this case, is the length of time it took for Appellant to file his initial assignment of errors brief on 12 July 2021, and the Government to file its answer on 7 September 2021. Appellant filed a reply on 16 September 2021. When considering the amount of time that elapsed after briefing was complete, the CAAF "will apply a more flexible review of this period, recognizing that it involves the exercise of the Court of Criminal Appeal's judicial decision-making authority." *Moreno*, 63 M.J. at 137. In *Moreno*, our superior court observed that "a period of slightly over six months is not an unreasonable time for review by the Court of Criminal Appeals." *Id.* at 138; *but*

---

[54] In opposition to Appellant's eighth motion for enlargement of time, the Government argued that, if granted, the 330-day delay "practically ensures" the court will not be able to comply with the CAAF's "appellate processing standards."

*see Anderson*, 2022 CAAF LEXIS 149, at *5 ("The delay highlighted by [a]ppellant resulted from the actions of the court reporter and the military judge and therefore was entirely under the Government's control."). Relevant too, on 3 August 2021, the court granted Appellant's 29 July 2021 motion for leave to file a supplemental assignment of error brief with regard to issue (8).[55] Additionally, one of Appellant's assignments of error required the court, on 22 July 2021, to order affidavits or declarations from trial defense counsel for evaluating whether he received constitutionally ineffective assistance from trial defense counsel. The next day, Appellant moved the court for reconsideration of that order, with a suggestion for en banc reconsideration, which the court denied on 10 August 2021.

Another reason for the delay is the extent to which the trial results were challenged on appeal, one indication of which is evidenced by the court allowing both parties to exceed page limits in appellate pleadings.[56] Another indication is that the 14-volume record of trial includes 2,218 pages of transcript. Many of the issues the court considered required the claimed errors to be determined in the factual context of several lengthy parts of the record of trial. Although none of the issues Appellant identified are especially complex, a lengthy decision was the result. Nonetheless, the court is cognizant that Appellant is entitled to be tried and sentenced by "a military justice system that not only is fair, but that also is perceived to be fair by members of the armed forces and the public." *United States v. Norfleet*, 53 M.J. 262, 268 (C.A.A.F. 2000). In the judgment of the court, a comprehensive decision is necessary to ensure Appellant received a fair trial that is also perceived to be fair, especially considering the large number of issues raised on appeal.

Turning to the raised issues, the court addressed and explained its rationale for 9 of Appellant's 13 assignments of error in a written decision. Several assignments of error required the court to address more than one legal or factual question such that this court was required to resolve substantially more issues than may be apparent from the number of errors that were identified. Appellant requested speedy appellate review of his case on 19 July 2021 after the Government submitted a motion for enlargement of time and motion to compel affidavits or declarations from trial defense counsel. Appellant again

---

[55] The Government responded to the supplemental assignment of error in its 7 September 2021 answer.

[56] The pleadings comprised 285 total pages. Appellant's military appellate defense counsel filed an 83-page brief in support of ten assignments of error, and a separate 15-page appendix in support of three issues Appellant personally raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). The Government answered in a 125-page pleading, and Appellant rejoined in a 56-page reply. Additionally, Appellant filed a six-page brief in support of a supplemental assignment of error.

requested speedy appellate review on 1 March 2022. However, Appellant has not pointed to any prejudice resulting from the presumptively unreasonable delay, and we find none.

Finding no *Barker* prejudice, the court finds the delay is not so egregious that it adversely affects the public's perception of the fairness and integrity of the military justice system. *See Toohey*, 63 M.J. at 362. We determine Appellant is not due relief even in the absence of a due process violation. *See Tardif*, 57 M.J. at 223–24. Applying the factors articulated in *Gay*, 74 M.J. at 744, the court finds appellate delay justified and relief unwarranted.

## III. CONCLUSION

The findings and sentence entered by the military judge are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d)(1), UCMJ, 10 U.S.C. §§ 859(a), 866(d)(1). Accordingly, the findings and the sentence are **AFFIRMED.**

CADOTTE, Judge (dissenting in part and in the result):

I respectfully disagree with my colleagues in the majority that the evidence is legally and factually sufficient to convict Appellant of assault consummated by a battery for grabbing KM's "torso" as alleged in Specification 2 of Charge II. *See United States v. King,* 78 M.J. 218, 221 (C.A.A.F. 2019) (stating the test for legal sufficiency is whether, after drawing all inferences in favor to the prosecution, a reasonable factfinder could have found all the essential elements of the crime beyond a reasonable doubt); *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987) (stating the test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt"). I also disagree the evidence is legally and factually sufficient to convict Appellant of the two specifications for violating a lawful general regulation as alleged in Specifications 1 and 2 of Additional Charge II.

### A. Unlawfully Grabbing KM's "Torso"

KM testified Appellant "grabbed [her] by [her] sweater . . . [a]nd somehow . . . he turned [her] around and had [her] against the wall." In doing so, he "walked backward with [her]." In her testimony, KM also agreed Appellant grabbed her by the shoulders. When Appellant testified, he admitted to grabbing KM by the shoulder which was consistent with his prior written statement. Based on the evidence at trial, I have no doubt Appellant grabbed KM

by the shoulder. However, to determine legal and factual sufficiency, the salient issue is whether the "shoulder" is part of the "torso." Unlike my colleagues, after reviewing the record, I am left unconvinced a rational trier of fact could have found that Appellant grabbed KM's torso. *United States v. Gutierrez*, 73 M.J. 172, 175 (C.A.A.F. 2014). Applying the standard for legal sufficiency, the evidence fails to meet the "very low threshold to sustain [the] conviction" as to grabbing the torso. *King*, 78 M.J. at 221. Likewise, after "weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," I am not convinced of the Appellant's "guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325.

The majority opinion focuses on definitions for "torso" and "shoulder," which I have also considered. The "torso" consists of: "the human body apart from the head, neck, arms, and legs: the human trunk." *See* Merriam-Webster, *Torso*, www.merriam-webster.com/dictionary/torso (last visited on 23 May 2022). Considering this definition, "torso" equates to "the human trunk." The definition of "shoulder," in the same reference, is: "the laterally projecting part of the human body formed of the bones and joints with their covering tissue by which the arm is connected with the trunk." Merriam-Webster, *Shoulder*, www.merriam-webster.com/dictionary/shoulder (last visited on 23 May 2022). When viewed together, I find that a rational factfinder, viewing the evidence in the light most favorable to the Prosecution, could not have concluded the "shoulder" is part of the "torso." Rather, the "shoulder" is separate and distinct from the "torso." In essence, the "shoulder" is the part of the body by which the arm connects to the "torso," not part of the "torso" itself. Considering these definitions and the evidence at trial, a rational factfinder could have reached the conclusion Appellant grabbed KM by one shoulder, or both shoulders. However, the evidence fails to prove beyond a reasonable doubt that Appellant grabbed the "torso." Likewise, after reviewing the record, I am left unconvinced that the evidence proves Appellant "grabbed" KM's torso.

I would except out the words "and torso" from Specification 2 of Charge II and affirm the finding of guilty as modified—that is, Appellant grabbed KM on her neck with his arms.

### B. Failure to Obey a Lawful General Regulation

Appellant argues his two convictions for failing to obey Air Force Instruction (AFI) 31-101, *Integrated Defense*, ¶ 8.4.2.4.1.4 (6 Jul. 2017)—by not registering two different firearms that he maintained in his on-base home—are not legally or factually sufficient. Each specification alleges a failure to obey a general regulation in violation of Article 92, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 892, *Manual for Courts-Martial, United States* (2019 ed.)

(2019 *MCM*).[1] The first element of this offense required the Government to prove beyond a reasonable doubt that AFI 31-101 was a lawful general regulation in effect during the charged time—1 January 2019 to 25 April 2019[2] and 1 April 2019 to 25 April 2019.[3] *See* 2019 *MCM*, pt. IV, ¶ 18.b.(1) (listing elements of Article 92(1), UCMJ, 10 U.S.C. § 892(1)).

### 1. Proper Publication of a General Regulation

General regulations are those regulations "generally applicable to an armed force which are *properly published* by the President or the Secretary of Defense, of Homeland Security, or of a military department . . . ." 2019 *MCM*, pt. IV, ¶ 18.c.(1)(a) (emphasis added). "[K]nowledge in fact of a general order emanating from a Department, or territorial, theater, or similar area command, is irrelevant, for the reason that it is conclusively presumed." *United States v. Arnovits*, 13 C.M.R. 94, 95 (C.M.A. 1953). "In a prosecution for a violation of Article 92, [UCMJ,] knowledge of a 'general order' need not be alleged or proved." *United States v. Tinker*, 27 C.M.R. 366, 367 (C.M.A. 1959) (citations omitted). For there to be presumption of knowledge of a general regulation, "some form of proper publication is necessary before such knowledge is presumed or there will be a violation of constitutional due process." *United States v. Tolkach*, 14 M.J. 239, 241 (C.M.A. 1982) (citation omitted). The *Tolkach* decision considered the following definition of "publish":

> To make public; to circulate; to make known to people in general. To issue; to put into circulation. To utter, to present (*e.g.* a forged instrument) for payment. To declare or assert, directly or indirectly, by words or actions, that a forged instrument is genuine. An advising of the public or making known of something to the public for a purpose.

*Id.* at 242.

*Tolkach* held "'publication' in the sense of the Manual for Courts-Martial occurs when a general regulation is received by the official repository for such publications on a base, such as the master publications library. Then it is available for reference by all base personnel." *Id.* at 244. Appellant argues AFI 31-101 was not "properly published" to constitute a lawful general regulation. I agree. Viewing the evidence presented at trial, in the light most favorable to the Prosecution, a reasonable factfinder could not have found that AFI 31-101

---

[1] All references to the UCMJ are to those contained in the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Specification 2 of Additional Charge II.

[3] Specification 1 of Additional Charge II.

was properly published. *King*, 78 M.J. at 221. Unlike my colleagues, I conclude that AFI 31-101 was not "properly published" in a manner to be enforceable as a lawful general regulation in accordance with Article 92(1), UCMJ.

### 2. AFI 31-101 Releasability Statement

The evidence presented at trial included portions of AFI 31-101 which had the following releasability statement on the first page: "Access to this publication is restricted.[4] This publication is FOUO [For Official Use Only]; requests for accessibility must be approved by the OPR [Office of Primary Responsibility]." The organization assigned responsibility for AFI 31-101 was the Department of the Air Force, Integrated Defense, Law and Order and MWD[5] Policy Division (AF/A4SP) which was designated as the OPR. During the charged timeframe,[6] electronic posting of restricted access unclassified publications was governed by AFI 33-360, *Publications and Forms Management*, ¶ 11.3.2 (1 Dec. 2015), which states:

> Controlled Unclassified Information [CUI]. CUI electronic publications may be made available for downloading on AFDPO's [Air Force Departmental Publishing Office] WMS [Warehouse Management System] or other approved locally managed web site. The WMS web site can restrict access to CAC [common access card] holders or further restrict by CAC holders identified on an OPR provided access list. Contact local security professional to help make accessibility/releasability determinations.

I conclude AFI 31-301, on its face, does not support a finding that it was published in a manner to constitute a lawful general regulation under Article 92(1), UCMJ. The instruction specifically states accessibility must be approved by the OPR without explanation as to which individuals or groups had access or would be eligible to gain approval for access. As a result, AFI 31-101 cannot be understood to be "available for reference by all base personnel." *Tolkach*, 14 M.J. at 244. When considering AFI 31-101's releasability statement along with AFI 33-360, AFI 31-101 could have been accessible to as many as all CAC holders, or as limited to only a select few CAC holders across the entire Air Force. Determination of who had access was left entirely at the discretion of the OPR and there was no evidence presented at trial identifying who had access to the

---

[4] Air Force Instruction (AFI) 31-101, *Integrated Defense*, ¶ 8.4.2.4.1.4 (6 Jul. 2017) was admitted into evidence with pages 3–161 and 166–314 redacted in their entirety.

[5] I understand MWD to be an acronym for military working dog.

[6] References to the charged time-frame encompass the combined time period for Specifications 1 and 2 of Additional Charge II—1 January 2019 to 25 April 2019.

instruction at the time of—or leading up to—Appellant's offenses. From reading AFI 31-301 and after reviewing the record of trial, I conclude no rational factfinder could determine which individuals or groups had access to the instruction.

### 3. Testimony on Accessibility of AFI 31-101

The Government also called three witnesses who testified to the accessibility of AFI 31-101 in an attempt to prove the instruction was properly published. The United States Air Force Academy (USAFA) Pass and Registration Center noncommissioned officer in charge testified that he had access to AFI 31-101 as a security forces member, but he believed that a "regular [A]irman" would not normally have access to such regulations. Then, the USAFA Publications Manager testified that the "official repository" for publications is the "EPublishing [ePubs]" website and she explained that restricted access publications are "listed on ePubs." However, the content of restricted access publications is not "readily accessible" to the public on ePubs. She explained that to view a restricted access publication—such as AFI 31-101—a military member can use their CAC through the WMS portal to request access to the restricted instruction. Finally, an individual mobilization augmentee (IMA) reservist paralegal assigned to the USAFA legal office testified she was able to download AFI 31-101 using her CAC through the WMS portal. Significantly, the Publications Manager and USAFA IMA paralegal both acknowledged that they did not attempt to access AFI 31-101 on or about the charged timeframe, and the Government presented no evidence as to who, if anyone, could access it during the charged window of 1 January 2019 to 25 April 2019.[7] I differ from my colleagues as I do not find it permissible to infer that AFI 31-101 was accessible to all military CAC holders during the charged timeframe based upon testimony that it was accessible outside the charged window. Accessibility to AFI 31-101 was at the discretion of the OPR and there is no way to determine how accessibility may or may not have changed with the passage of time based on evidence presented at trial.

### 4. Weapon Registration Form

The Government also introduced into evidence a "Weapon Registration Form," prepared by Forest City Residential Management Inc, (FCRM) and used by the USAFA privatized housing office where Appellant resided. The form advised residents that "[t]he possession of personal firearms, government-owned arms and ammunition will be in accordance with the laws of the State of Colorado and any local laws or ordinances." It further stated "[a]ll firearms must be registered with the Neighborhood Management Office and in

---

[7] Encompassing Specifications 1 and 2 of Additional Charge II.

accordance with [the policies of the] 10th Security Forces [Squadron] at the Air Force Academy within three (3) days of occupancy or procurement of firearms." Significantly, nowhere on the form is AFI 31-101 mentioned, or was there any mention of the registration requirement being a "general regulation." The form only states, "Failure to adhere to this provision is a material breach of the Lease Agreement." Appellant signed this form on 26 February 2015. At the time he signed this form, Appellant did not state he owned any firearms. I find it telling that the date of the base housing "Weapon Registration Form," included as part of FCRM's 2013 *Community Handbook*, and the date Appellant signed the form, 26 February 2015, both predate the issuance of AFI 31-101 by over two years.[8] Therefore, I disagree with the majority that "[e]vidence of proper publication may be inferred from the fact that the housing office required residents to comply with firearm registration requirements." The FCRM "Weapon Registration Form" is unpersuasive as evidence of AFI 31-101's proper publication because the form predates the instruction, does not reference the instruction, and only warns that a failure to register firearms is a material breach of the lease agreement.

### 5. Conclusion

Unlike my colleagues in the majority, I find that a rational factfinder, based on the evidence at trial, could not infer from the evidence in the record that AFI 31-101 was properly published. Just as "a commander cannot sign a regulation, put it in his desk drawer, and then expect his subordinates to be presumed to have knowledge of it," a regulation cannot have its access restricted and impute knowledge of it onto Airmen. *Tolkach*, 14 M.J. at 242. In order for knowledge to be imputed, members of the command to which the regulation applies must be afforded the opportunity to actually read the regulation in question. It is not enough to show that it was accessible after the charged

---

[8] I agree with my esteemed colleagues that based upon *United States v. McCormick*, No. ACM 38743, 2016 CCA LEXIS 384, at *2 (A.F. Ct. Crim. App. 23 Jun. 2016) (unpub. op.), Air Force Instruction (AFI) 31-101, *Integrated Defense*, ¶ 8.4.2.4.1.1 (2013), required privately-owned firearms stored on Air Force installations to be registered with security forces. However, I find consideration of the 2013 version of AFI 31-101 insufficient for showing that the regulation in effect at the time of the offenses in issue was legally enforceable as a lawful general regulation under Article 92, UCMJ. The full text of the prior version of AFI 31-101 is not before us, as it was not admitted as evidence during the court-martial and therefore is not part of the record. I also find it noteworthy that *McCormick* did not involve a violation of a general regulation, as Appellant was found guilty of dereliction of duty for failing to comply with the AFI 31-101 firearm registration requirement that existed at that time. *McCormick*, 2016 CCA LEXIS 384, at *1 (unpub. op).

timeframe, rather it must be shown it was properly published prior to the violation. For the reasons stated above I would find both convictions for violation of Article 92, UCMJ, legally and factually insufficient.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court